AVONDALE INDUSTRIES, INC. and Ogden Corporation, Plaintiffs,

v.

The TRAVELERS INDEMNITY COMPANY, Defendant.

The TRAVELERS INDEMNITY COMPANY, Third–Party Plaintiff,

v.

COMMERCIAL UNION INSURANCE COMPANY, Highlands Insurance Company, American Motorists Insurance Company, and National Union Fire Insurance Company, Third–Party Defendants.

No. 86 Civ. 9626 (KC).

United States District Court, S.D. New York.

Sept. 17, 1991.

Hugh N. Fryer, Fryer, Ross & Gowen, New York City, for plaintiffs and third-party plaintiff.

Patrick J. Dwyer, Heidell, Pittoni, Murphy & Bach, Seth Ribner, Simpson, Thacher & Bartlett, New York City, Emily Levin, Rivkin, Radler, Bayh, Hart & Kremer, Uniondale, N.Y., Marlene Monteleon, Bivona & Cohen, New York City, James Sweet, Drinker, Biddle & Reath, Philadelphia, Pa., for defendant and third-party defendants.

## OPINION AND ORDER

CONBOY, District Judge:

This is an insurance coverage case. Avondale Industries, Inc. and its former corporate parent, Ogden Corporation (collectively "Avondale", except where noted), brought this diversity action seeking a declaration that The Travelers Indemnity Company ("Travelers") has a duty to defend and to indemnify Avondale pursuant to several Comprehensive General Liability policies written by Travelers. Avondale seeks coverage for fourteen private actions and a State administrative proceeding (collectively, the "underlying actions") brought against Avondale as a result of the escape of petroleum and chemical pollution from a waste oil dump and reclamation facility in Louisiana to which Avondale shipped waste

oil containing various hazardous chemicals. Partial summary judgment has been entered in this action previously, declaring that Travelers has a duty to defend the underlying actions. *Avondale Industries, Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314 (S.D.N.Y.), *partial judgment entered*, 123 F.R.D. 80 (1988), *aff'd*, 887 F.2d 1200 (2d Cir.1989), *reh'g denied*, 894 F.2d 498 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).

Travelers impleaded the four third-party defendants—other insurers which wrote Comprehensive General Liability ("CGL") policies for Avondale covering different time periods than Travelers' policies—and now moves for partial summary judgment against them, seeking a declaration that they must share in the costs of Avondale's defense.[1] The four third-party defendants—Commercial Union Insurance Company ("Commercial Union" or "CU"), Highlands Insurance Company ("Highlands"), American Motorists Insurance Company ("AMICO"), and National Union Fire Insurance Company ("National Union" or "NU")—have cross-moved for a declaration that they have no obligation to defend or indemnify Avondale or to contribute to Travelers' expenses in defending the underlying actions. For the reasons discussed below, we grant in part and deny in part Travelers' motion, grant the motions of Commercial Union, Highlands, and National Union, and deny the motion of AMICO.

## I. *Factual Background*[2]

Avondale Shipyards, Inc.[3] operated at its Louisiana yards a facility that removed oil and chemical residue from barges. Prior to 1968, the waste oil and chemicals were incinerated at the shipyard. After 1968, the waste was sold or given to truckers who trucked it off site. Starting in December 1975, Avondale contracted with Mays-

---

1. Travelers has withdrawn its request for a judgment of money damages and at this time seeks only declaratory relief. (September 24, 1990 letter to Court from Seth Ribner at 2.)

2. This section is included for the purpose of background and orientation, and is not intended as a formal finding of facts.

3. Avondale Shipyards, Inc. became a subsidiary of the Ogden Corporation, a conglomerate, in the early 1970s. In 1985, Avondale Industries, Inc. was spun off as a separate corporation, including as one of its divisions Avondale Shipyards, Inc.

ville Oil Company for Maysville to pick up and dispose of Avondale's waste oil. This arrangement evidently continued in force until 1979. (Levin Affid., Ex. C; Sweet Affid., Ex. M.)

Meanwhile, from 1961 to 1977 Earl Dubose owned and operated a waste oil dump and reclamation/recycling facility in Denham Springs, Louisiana ("the Site"). (Levin Affid., Ex. D.) In December 1977, Dubose sold the facility to Combustion, Inc. (Sweet Affid., Ex. M) which continued to operate it until May 1982. Combustion also acquired Maysville Oil Company, which thereupon brought to the Site for processing the waste oil it collected.

The Site was the subject of several inspections by State and Federal environmental regulatory authorities, in response to complaints from the Site's neighbors. The Federal EPA conducted "potential hazardous site" inspections in 1981 and 1984. (Sweet Affid., Exs. C–E.)

On January 3, 1986, the Louisiana Attorney General, acting at the request of the Louisiana Department of Environmental Quality, sent to Avondale, among others, a "potentially responsible party" letter, in connection with the clean-up of the Site (the "LADEQ letter" or "PRP letter"). The letter notified its recipients that the Secretary of the DEQ "has determined that there is a discharge or disposal that has occurred at [the Site] which presents an imminent and substantial endangerment to health or the environment," and that "[w]e have reason to believe that you are a potentially responsible party under the provisions of Louisiana Revised Statute 30:1149.41 through 1149.50." The letter demanded that the PRP provide the DEQ with "all information on hazardous substances disposed of or discharged ... by you at this site," including dates and manner of disposal, "submit a plan for remedial action at the site ... or pay ... the full costs of a remedial action" to be undertaken by DEQ, and attend an upcoming meeting, all under the express threat of a lawsuit and administrative fines. (Monteleone Affid., Ex. E.)

Thereafter, between July 1986 and June 1988, fourteen private lawsuits, eventually consolidated, were commenced in Louisiana State court.[4] The private actions, together encompassing the claims of hundreds of plaintiffs (not including class action plaintiffs) seeking over $17 billion in damages, each name some 70 to 80 defendants, including Avondale, and assert claims for damages for personal injury, wrongful death, and injury to property under theories of negligence and strict liability. (July 1990 Ribner Affid., Ex. B.) While there are some minor differences among the complaints, all allege that the Combustion, Inc. Site has been operating from the mid–1960s,[5] and none attempt to differentiate among the defendants in their allegations.[6] The vague and open-ended allegations set out in the margin are typical of the language used in the underlying private actions.[7]

Avondale received a complaint in one of the private actions no later than August 20, 1986. Five actions were filed between July and September 1986, and nine others were

---

**4.** One of the "private" lawsuits was brought by the Livingston Parish Police Jury, among other plaintiffs.

**5.** Two complaints allege operation from the late 1960s.

**6.** One complaint does distinguish broadly between operator-defendants and producer-defendants.

**7.** "[F]rom a period of time commencing during the mid–1960s until the present, the defendants either owned, maintained, operated, transported to, produced, manufactured[,] caused to be stored, burned or buried toxic and/or hazardous wastes at [the Site].

During the period of time alleged, supra, the defendants produced, received, stored, caused to be stored, transported, caused to be transported, buried, burned or disposed of certain hazardous toxic wastes including but not limited to the following chemicals: [listing several hazardous chemicals]. Defendants falsified and/or coded their records so as to conceal the identities of the toxic waste producers, their operating procedures and the type and nature of the toxic materials received, stored, buried and burned."
*Boone, et al. v. Dubose, et al.,* No. 50,375 (21st Jud.Dist.Ct. Parish of Livingston, La.) (filed Aug. 1 1986) (July 1990 Ribner Affid. Ex. B).

filed between December 1986 and June 1988. Avondale first notified Travelers of a "potential claim" on March 20, 1986, in response to the LADEQ letter. On October 17, 1986, Avondale notified Travelers of the first five private actions, forwarding copies of the complaints, and followed up with this lawsuit, commenced in December 1986. Avondale did not, however, notify Commercial Union, National Union, AMICO, or Highlands, until March, 1987, at approximately the same time as the four insurers were impleaded by Travelers in this action.

Avondale purchased a series of primary comprehensive general liability insurance policies from the five insurers involved in this action. There is no dispute that the coverage periods ran as follows:

Commercial Union: January 1, 1960 to January 1, 1970, and January 21, 1971 to July 5, 1972.

Highlands: January 1, 1970 to January 21, 1971.

AMICO: July 5, 1972 to July 5, 1975.

Travelers: July 5, 1975 to December 1, 1984.

National Union: December 1, 1984 to August 5, 1986.

It is not clear from the record before us whether Avondale at any time has made a demand for coverage from any of the third-party defendants.

Travelers now seeks contribution from the third-party defendants pursuant to the equitable rule that where "several insurers bind themselves to the same risk and one insurer pays the whole loss, the one so paying has a right of action against his coinsurers for a ratable proportion of the amount paid by him...." *Zurich–American Ins. Co. v. Atlantic Mutual Ins. Co.*, 139 A.D.2d 379, 387, 531 N.Y.S.2d 911, 916 (1st Dep't 1988), *aff'd*, 74 N.Y.2d 621, 541

N.Y.S.2d 970, 539 N.E.2d 1098 (1989). Travelers also relies on its contractual rights as subrogee to Avondale's claims against the third-party defendants. Travelers Reply Mem. at 2 n. 1.[8]

## II. *Discussion*

### A. Choice of Law

In our earlier decision, we held that New York law applies to the Travelers policies under consideration in this action, but reserved judgment on any other policies that might come to be in issue. *Avondale Industries, Inc. v. Travelers Indem. Co.*, 697 F.Supp. at 1316 and n. 2. Commercial Union and Highlands now contend that their contracts should be governed by Louisiana law. AMICO contends that New York law applies to its policies. AMICO Memo. at 5 n. 6. National Union does not expressly address the issue, but seems to assume that New York law applies to its policies. No party contests the choice of law selection advocated by any other party as applicable to its policies.

Sitting in diversity, we apply the choice of law rules of the forum state, New York. In insurance coverage actions, "New York generally gives controlling effect to the law of the jurisdiction which has the greatest interest in the matter. Important factors in making this determination are, for example, location of the insured risk, residence of the parties, and where the contract was issued and negotiated." *Munzer v. St. Paul Fire & Marine Ins. Co.*, 145 A.D.2d 193, 200–01, 538 N.Y.S.2d 633, 637 (3d Dep't 1989) (citations omitted); *see also, e.g., Ethicon, Inc. v. Aetna Cas. and Sur. Co.*, 688 F.Supp. 119, 123–24 (S.D.N.Y.1988).

**8.** Travelers' policies with Avondale provide: "[I]f any insurer affording other insurance to the named insured denies primary liability under its policy, [Travelers] will respond under this policy as though such other insurance were not available, provided that [Travelers] shall be subrogated to all rights of the insured to such other insurance and the insured shall do all things necessary to enforce such rights." *E.g.* Carroll Affid. Ex. G at 6374.

Another provision of the policies states: "In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefore against any person or organization ... and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights." *E.g.*, Carroll Affid. Ex. G at 6375.

■ We agree that as to Commercial Union and Highlands, Louisiana law is appropriately applied. The policies of both insurers were signed in Louisiana, were brokered by Louisiana brokers, and issued to a Louisiana corporation (Avondale Shipyards, Inc.) with its principal place of business and its insured interest located in Louisiana. The underlying actions involve a Louisiana site and were brought by Louisiana public agencies and residents.

■ We also agree that as to AMICO and National Union, New York law applies. These policies were signed in New York, were brokered by New York brokers, and covered Delaware Corporations (Ogden Corp. and Avondale Industries, Inc.) with their principal place of business in New York, and with operations and insured interests located in a wide geographic range.[9] No other party has objected to AMICO's express and NU's implicit choice of New York law, and "there are enough contacts with New York to warrant honoring" the parties' selection. *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1372 (E.D.N.Y.1988).

**B. Limits of Impleader**

■ , Commercial Union and Highlands contend that because Travelers has brought this action as a third-party plaintiff seeking reimbursement, it may only recover from the third-party defendants to the extent that they are liable to Travelers "for all or part of [Avondale's] claim against [Travelers]." Fed.R.Civ.P. 14(a). CU and Highlands contend that because Avondale's complaint in this action alleges that it shipped oil waste between December 1975 and October 1979 (Complaint ¶ 8 (Monteleone Affid., Ex. Q)), this action is limited to a resolution of the dispute concerning insurance coverage for liability arising out of shipments during that period only. Therefore, they contend, Travelers faces no liability in this action for coverage not arising out of those shipments, and accordingly cannot seek here to implead the other carriers, whose policies were not in effect during that time.

This contention is meritless. Avondale seeks in this action a declaration that "Travelers is obligated to defend and indemnify Avondale with respect to" the underlying actions. (Complaint at 8 ¶ 2.) The dates of shipment are irrelevant to Avondale's liability in the underlying actions. The cost of defending the underlying actions, which Travelers is obligated to pay, cannot meaningfully be separated between pre- and post-December 1975 shipments. Thus, though Avondale's allegations in the complaint refer to shipments from 1975–1979, in actuality Avondale is necessarily seeking in this action a complete defense of the underlying actions regardless of any ultimate determination of the precise dates of shipment of the waste oil, and Travelers has the right to seek in its third-party action reimbursement for those defense costs.[10]

**C. Expiration of Coverage Prior to Any Waste Oil Shipments**

**1. *Duty to Defend—Applicable Standards***

■ Under both New York and Louisiana law, a liability insurer's duty to supply

---

**9.** Curiously, although the July 1972—July 1973, and the July 1974—July 1975 AMICO policies covered Ogden Corporation, and list its New York offices as the "Mail Address," the July 1973—July 1974 policy covers "Avondale Shipyards, Inc. and/or all present and/or future subsidiary [sic], affiliated or associated companies, and/or corporations as now or hereafter constituted" and lists Avondale, Louisiana as the "Mail Address". (July 1990 Ribner Affid., Exs. F–H.) That policy too, however, was countersigned in New York and brokered by a New York broker, and we believe New York law may properly apply to it as well as to the two policies which surround it.

We also note that although Avondale's complaint in this action alleges that the principal place of business of Avondale Industries, Inc. is Boston, Massachusetts, the address listed on the cover page of the August 1985—August 1986 National Union policy (the only policy at issue here written to Avondale Industries, Inc.) is in New York City. (*Id.,* Ex. J.)

**10.** Contrary to Commercial Union's contention, Avondale's admission in its complaint in this action that it shipped waste oil to the Site from 1975 to 1979 is not, of course, conclusive proof that Avondale did not also ship waste oil at an earlier date.

a defense to its insured in an underlying action is generally defined solely by a comparison of the allegations of the underlying complaint to the provisions of the insurance policy (the "four corners of the complaint" rule). Because the insurer is obligated to defend an underlying action against its insured even when the allegations against the insured are groundless, false, or frivolous, an insurer generally may not base its decision to deny a defense on information extrinsic to the allegations of the complaint. *E.g., Fitzpatrick v. American Honda Motor Co.,* 78 N.Y.2d 61, 63, 571 N.Y.S.2d 672, 672, 575 N.E.2d 90, 90 (1991) ("[A] liability insurer has a duty to defend its insured in a pending lawsuit if the [underlying] pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered."); *Seabord Sur. Co. v. Gillette Co.,* 64 N.Y.2d 304, 310–11, 486 N.Y.S.2d 873, 875–76, 476 N.E.2d 272, 274–75 (1984); *Jensen v. Snellings,* 841 F.2d 600, 612 (5th Cir.1988) (applying Louisiana law, collecting cases) ("The duty to defend is determined solely from the [underlying] plaintiff's pleadings and the face of the policy, without consideration of extraneous evidence.... [I]f there are *any* facts [alleged in the underlying complaint] which, when taken as true, support a claim for which coverage is not unambiguously excluded, then the duty to defend arises."); *American Home Assurance Co. v. Czarniecki,* 255 La. 251, 230 So.2d 253, 259 (1969).

■ An insurer, however, has no duty to defend where there are no circumstances under which it would be required to indemnify the insured for any damages for which the insured might be found liable in the underlying action. Thus if an insurer can demonstrate as a matter of law that the allegations of the underlying complaint do not bring the claim within the coverage afforded by the policy, the insurer has no duty to defend. *E.g., Allstate Ins. Co. v. Zuk,* 78 N.Y.2d 41, 45, 571 N.Y.S.2d 429, 431, 574 N.E.2d 1035, 1037 (1991) ("[A]n insurer can be relieved of its duty to defend if it establishes as a matter of law

that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision.") (citing *Villa Charlotte Bronte v. Commercial Union Ins. Co.,* 64 N.Y.2d 846, 848, 487 N.Y.S.2d 314, 315, 476 N.E.2d 640, 641 (1985); *Spoor–Lasher Co. v. Aetna Cas. & Sur. Co.,* 39 N.Y.2d 875, 876, 386 N.Y.S.2d 221, 222, 352 N.E.2d 139, 140 (1976)); *Jackson v. Lajaunie,* 264 La. 181, 270 So.2d 859, 864 (1972) ("Since the petition alleged the facts, and the facts showed that coverage was excluded, there was no obligation on the part of [the insurer] to defend [the insured's] claim."); *White v. Robinson,* 367 So.2d 1358, 1360 (La.App.) ("A defense is owed only when the policy provides coverage."), *writ denied,* 369 So.2d 157 (La.1979).

■ "The insurer's duty to defend is ... not an interminable one, and will end if and when it is shown unequivocally that the damages alleged would not be covered by the policy." *Sturges Manufacturing Co. v. Utica Mutual Ins. Co.,* 37 N.Y.2d 69, 74, 371 N.Y.S.2d 444, 449, 332 N.E.2d 319, 322 (1975). Thus, where a court can determine conclusively that there is no genuine dispute as to an extrinsic fact which when applied to the underlying allegations limits them to a claim not covered by the policy, the insurer no longer need defend. In making such a determination, the court may thus, in exceptional circumstances, look outside the four corners of the complaint to consider whether extrinsic evidence establishes to a certainty that the insurer faces no liability for indemnity. "[W]hile it is true that a court should be hesitant to leave the boundaries of the complaint in making its determination on an insured's duty to defend, it need not ignore positive proof, extrinsic to the complaint, that assists in clarifying an ambiguous allegation." *Town of Moreau v. Orkin Exterminating,* 165 A.D.2d 415, 418, 568 N.Y.S.2d 466, 468 (3d Dep't 1991) (citations omitted). *See also, e.g., City of Johnstown v. Bankers Standard Ins.,* 877 F.2d 1146, 1149, 1151–52 (2d Cir.1989) (applying New York law) (court considers extrinsic evidence); *Lionel Freedman, Inc. v. Glens Falls Ins. Co.,* 27 N.Y.2d 364, 369, 318

N.Y.S.2d 303, 306, 267 N.E.2d 93, 95 (1971) (where duty to defend would be based solely on "one patently 'groundless' and 'shotgun' allegation," court relies on extrinsic evidence to relieve insurer of its duty to defend); *County of Broome v. Aetna Cas. & Sur. Co.*, 146 A.D.2d 337, 341, 540 N.Y.S.2d 620, 622 (3d Dep't 1989), (court leaves four corners of complaint and refers to "the record [which] indicates that plaintiff was aware of the problems at the landfill"), *appeal denied*, 74 N.Y.2d 614, 547 N.Y.S.2d 848, 547 N.E.2d 103 (1989); *Contracting Plumbers' Corp. v. Hartford Accident and Indem. Co.*, 59 A.D.2d 921, 399 N.Y.S.2d 255 (2d Dep't 1977), *aff'd*, 46 N.Y.2d 857, 414 N.Y.S.2d 515, 387 N.E.2d 226 (1979). *Accord, White v. Robinson*, 367 So.2d at 1359–60 (on summary judgment, court relies on affidavits and deposition to establish that insurer had no duty to indemnify and hence no duty to defend); *Schilling v. Bigelow Liptak Corp.*, 427 So.2d 452, 455–56 (La.App.1982), *writ denied*, 433 So.2d 181 (La.1983) (court finds no duty to defend, based apparently on evidence extrinsic to the underlying complaint, establishing that injury did not occur within policy period).

 While as a general rule, such a determination is made only by the court hearing the underlying action itself, where the factual issue central to the insurance coverage dispute is collateral to the underlying action, so that it is irrelevant to the underlying action and will not be addressed there, the court which has jurisdiction over the declaratory coverage action may make the determination. *Allstate Ins. Co. v. Santiago*, 98 A.D.2d 608, 608, 469 N.Y.S.2d

343, 344 (1st Dep't 1983); *Hollander v. Nationwide Mutual Ins. Co.*, 60 A.D.2d 380, 401 N.Y.S.2d 336, 338 (4th Dep't), *appeal denied*, 44 N.Y.2d 646, 406 N.Y.S.2d 1026, 378 N.E.2d 127 (1978). *See also, American Home Products Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760, 766 (2d Cir.1984) (coverage court may decide relevant issues if collateral to underlying case, or may defer to underlying court); *Colon v. Aetna Life and Cas. Ins. Co.*, 66 N.Y.2d 6, 10, 494 N.Y.S.2d 688, 690, 484 N.E.2d 1040, 1042 (1985) (duty to defend continues until judicial determination, either in underlying action or in coverage action, of issue relevant to coverage); *White v. Robinson*, 367 So.2d at 1359–60; *Schilling*, 427 So.2d at 456.[11]

Thus, if the issue is collateral to the underlying action, an insurer may, in rare instances, be permitted to attempt to demonstrate in the coverage action, using evidence extrinsic to the allegations of the underlying complaint, that it is impossible that the insured would be entitled to indemnification for any liability imposed on it in the underlying action. If it can make such a showing, the insurer's duty to defend is at an end.

 Here, Commercial Union and Highlands each contend that it is impossible that it would ever be required to indemnify Avondale in connection with the underlying actions, because no event for which liability could attach to Avondale in the underlying actions took place until after the expiration of its policy period. Specifically, Highlands contends that none of Avondale's waste oil was transported to the Site until after January 21, 1971, the last date of its coverage

11. Travelers points to the statement in *Colomb v. United States Fidelity and Guar. Co.*, 539 So.2d 940, 944 (La.App.1989) that the consideration of extrinsic evidence would, if "followed to its logical conclusion, ... require a trial between the insured and insurer as to when an occurrence happened, which would render insurance defense coverage meaningless." While several Louisiana cases do state forcefully the terms of the four corners rule, *see, e.g., Jensen*, 841 F.2d at 612; *Sullen v. Missouri Pacific R. Co.*, 750 F.2d 428, 433 (5th Cir.1985) (applying Louisiana law), we do not believe that the dicta from the intermediate appellate court in *Colomb* compels the conclusion that Louisiana law forbids, in any and all circumstances, the consideration of extrinsic evidence in a coverage dispute; indeed Louisiana courts have considered such evidence. *See White v. Robinson, supra; Schilling, supra.* Moreover, the rationale of *Columb*'s dicta is not applicable to the instant case, where the insured is indeed receiving a full defense, extensive discovery on coverage issues has taken place, and the four corners rule is being invoked for the benefit of an insurer, not the insured. The similar rationale of *State of New York v. Blank*, 745 F.Supp. 841, 850 (N.D.N.Y.1990), criticizing and rejecting departure from the four corners rule, is likewise inapplicable here.

period; Commercial Union contends that no waste oil was transported to the Site until after July 5, 1972, the last date of its coverage period.

The issue of precisely when Avondale first shipped its waste to the Site is one that is irrelevant to both the LADEQ clean-up proceeding and the private actions, both of which sound, entirely or in part, in strict liability and will likely focus on issues of causation and damages. To the extent individual waste generators' behavior is examined, the inquiry will likely focus on the types and overall amounts of waste shipped, not the precise date of the first shipment from a given generator. Travelers itself recognizes that this issue is collateral to the underlying actions, pointing out that the underlying action will focus on causation and damages, while this action "focuse[s] almost exclusively upon issues of contract interpretation and Avondale's waste disposal operations." (January 15, 1988 Ribner Affid., attached as exhibit A to October 4, 1990 Patrick Dwyer Affid.) Moreover, extensive and thorough discovery has been completed on precisely this issue in the instant action, with a concomitant expenditure of time, effort, and money. Most notably, Travelers has engaged in a dogged attempt to demonstrate that Avondale's waste oil was shipped to the Site prior to the commencement of the Travelers policy's coverage in July 1975.[12] Finally, Avondale is being provided by its insurer with a defense in the underlying action, and the instant motions do not directly involve Avondale's rights to defense coverage. Given this unusual posture and context, it is accordingly proper to consider the extrinsic evidence that has been developed and presented to the Court, on the issue of the dates of Avondale's shipments of waste oil to the Combustion Site.

### 2. *Lack of Sufficient Evidence of Any Shipments Prior to July 1972*

With respect to the July 1975 cut-off date (the date on which AMICO's coverage terminated and Travelers' commenced), the evidence produced during discovery has yielded a clear-cut dispute of fact which can not be resolved on summary judgment. According to several truck drivers who worked for Dubose hauling waste oil, waste oil was picked up from the Avondale shipyards and brought to the site in late 1974 and early 1975. (Depositions of Albert Tigner, David Nickel, Willie James, Thomas Latham.) According to other competent witnesses, however, none of Avondale's waste oil was disposed of at the Site prior to a later date, variously December 1976 (November 6, 1987 Dubose Affid. (Sweet Affid., Ex. M)), or when Combustion, Inc. took over the site in 1977. (January 21, 1989 Dubose depo. (Sweet Affid., Ex. N); Norman Lee Miller depo. (December 6, 1990 Feldman Affid., Ex. A).) Whether or not Avondale's waste oil was shipped to the Site prior to July 5, 1975, the commencement of Travelers coverage period, is thus a question which cannot be resolved on this motion, and must await determination by the trier of fact.

■ Travelers contends that there is evidence supporting the possibility that Avondale shipped waste oil at a considerably earlier date—i.e. at a date falling within the policy periods of Commercial Union and Highlands. The only evidence, however, that such shipments were made is the unreliable deposition testimony of Leo Schilling, a Dubose employee who, some sixteen years after the events in question, testified without elaboration in response to leading questions that he "would say [he] was" making trips from Avondale in 1972, and that he and other drivers were making trips from Avondale in 1972 and 1973. (Schilling depo. at 33–36 (March 1988 Ribner Affid., Ex. E, Sweet Affid., Ex. J, Levin Affid., Ex. I, Dwyer Affid., Ex. C).) Significantly, Mr. Schilling could not recall whether he started working at Dubose in 1970 or 1971, stating, "I don't remember the year. I never—never keep up with the years or anything." (*Id.* at 7, 10.) Schill-

---

**12.** Travelers has taken at least 23 depositions so far in this action regarding the details of Avondale's waste disposal activities, including the dates during which the waste oil was disposed of by various methods and through various third parties. (October 1990 Dwyer Affid. at ¶¶ 2–4.)

ing stated that he did not believe he picked up waste oil from Avondale at the beginning of his tenure at Dubose, "it was a little later on, I believe." (*Id.* at 15.) In addition, Schilling did not know when the price of gasoline and oil shot up, a date of some significance in the history of Dubose's oil business. Moreover, certain other testimony of Mr. Schilling strongly suggests that the period he was recalling was actually some time no earlier than 1973.[13] Mr. Schilling was seventy-four years old at the time of his January 1988 deposition and had had open-heart surgery one month before giving his testimony concerning the events of sixteen years prior. (*Id.* at 33, 40.) He was taking "four or five" different types of medications at the time, "one of them is a diabetic pill, one is a high blood pressure pill, I don't know what the rest of them are." (*Id.* at 40–41.) In any event, Mr. Schilling's testimony does not even purport to locate the start of the shipments at any particular date, month, or even season of the year 1972. A conclusion based on this testimony that Avondale shipped waste oil before July 5, 1972 would be the product of impermissible speculation. Based on the nature and circumstances of Mr. Schilling's testimony, we believe that no reasonable trier of fact could find from this testimony alone that Avondale shipped oil to the Site prior to July 5, 1972; any such finding would have to be set aside as unsupported by the evidence.

Travelers also points to the testimony of several Avondale foremen and officials that between 1968 and 1975 Avondale's waste oil was picked up by a trucker named Frank Meyers, and that they did not know where or how Meyers ultimately disposed of the oil. (Depositions of Roy Toepfer, Emile Guidry, David McBride.) Travelers has come forth with absolutely no evidence, however, which would permit an inference that the oil was disposed of at the Site.

Such a finding may not be based on sheer speculation.

■ In view of the extensive discovery already completed on this issue, it can thus be determined as a matter of law that at a trial of this action, Travelers would be unable to meet its burden, as the party attempting to invoke insurance coverage, of proving that any of Avondale's waste oil was transported to the Site during the policy periods of Highlands or Commercial Union. Because Travelers, the party demanding coverage, would be unable to demonstrate that any events relevant to the underlying actions took place during the coverage periods of Highlands and Commercial Union, it would not be entitled to a declaration that Highlands and CU are liable for indemnification of Avondale. We may thus now make a conclusive judicial determination that Highlands and CU could not have any duty to indemnify in connection with the underlying actions, and accordingly they are relieved of any duty to defend.

### 3. *Defense Costs Incurred To Date*

■ Normally, where an insurer is relieved of the duty to defend by a judicial determination that despite allegations of the underlying complaint bringing it within the policy's coverage, there is no duty to defend, the insurer nonetheless is liable for the defense costs incurred in the underlying action up until the time of the judicial determination. *See Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F.Supp. 1213, 1220 (S.D.N.Y.1986). In the special circumstances of this case, however, application of that rule is not required and would be inequitable.

As discussed below in Section II(D), there is an issue in this action as to whether the third-party defendants are excused from their obligations because they were not supplied with timely notice of occurrence or claim. As to AMICO, we hold

---

**13.** For example, Mr. Schilling testified that Thomas Latham was already employed at Dubose when Schilling started there (Schilling depo. at 42), although Mr. Latham, according to his own testimony, started at Dubose in June 1973. (Latham depo. at 12.) Schilling also tes-

tified that the waste oil retrieved from Avondale was blended to be sold as fuel oil. (*Id.* at 29.) Dubose, however, did not blend fuel oil for resale until it became profitable to do so in the wake of the 1973 oil embargo. (January 1988 Dubose depo. at 87–89 (Levin Ex. D).)

that resolution of this question must be left to the trier of fact, *infra*, at 1431–33, and we would reach the same conclusion with respect to Commercial Union and Highlands were it necessary to address the issue as to them.[14] Should the trier of fact find that Avondale's late notice was unexcused, CU, Highlands, and AMICO would be relieved of any obligations, but Travelers might be able to proceed against Avondale for reimbursement of any insurance payments that would have been available to defray Travelers' expenditures but for Avondale's failure to notify the other insurers promptly.

■ In such an event, were we now to hold Highlands and Commercial Union liable for a share of defense expenditures to date, Travelers might be able to recover from Avondale sums representing the would-be defense cost contributions of insurers who have since been held to have no duty to indemnify or defend. In other words, Travelers would be able to recover from its own insured costs assessable only because the "four corners" rule mandates insurance coverage according to the allegations of the underlying complaint, not the actual factual content of the litigation. We believe it is anomalous and inequitable for an insurer to use the four-corners rule against the insured itself, and we decline to countenance the possibility of such a use.

■ To hold otherwise would further increase the already profound and widespread repercussions of the fortuities and random variations of the complaint in any given underlying action on insurance coverage availability. While, given the formalistic nature of a legal proceeding, the insured must be able to receive a defense from its insurer when those fortuities put the insured even theoretically at risk of incurring an adverse judgment,—the insurer and insured having contracted for "liability insurance"—that same concern for protecting an insured against the high cost of defending

even a frivolous or mis-pleaded action (the basis behind the "four corners rule") is not applicable where an insurer seeks to invoke the rule as a means of reducing its share of defense costs. The rule is for the benefit of the insured, and where the insured makes a good-faith decision not to invoke the rule's full benefits, based on the insured's correct knowledge that the other insurers have no duty to indemnify, the necessity for application of the exceedingly formalistic four-corners rule is at an end, and no sensible purpose would be served by permitting the ramifications of the fortuities of the underlying pleading to continue on indefinitely. Thus Travelers, the insurer against which the claim for defense has been made, and which has been unable to demonstrate that either Highlands or Commercial Union are even conceivably on the risk for indemnity purposes, may not invoke the formalistic rule for its own exclusive benefit.

■ It is true that a prompt demand by Avondale for coverage from Highlands and Commercial Union would likely, based on the "four corners" doctrine, have obligated those insurers to contribute to Avondale's defense. From that perspective, should Avondale be found to have forfeited coverage due to late notice, Travelers will have suffered economic harm due to Avondale's tardiness, and arguably should be allowed to seek recompense from Avondale for that injury (perhaps under the contractual provisions that require Avondale to protect Travelers' subrogation rights). We decline, however, to penalize Avondale for not making a claim for defense against insurers where Avondale had a good faith and correct belief that those insurers did not provide coverage during the time that Avondale shipped waste oil. Any such demand by Avondale would have been simply an attempt to take advantage of the "four corners doctrine" in the context of extraordinarily broad and vague underlying complaints asserted without differentiation

---

**14.** Based on our holding in this section of our opinion, Highlands and Commercial Union are entitled to summary judgment, and they do not remain in the action for consideration of their late notice defense. Were we here to hold oppo-

sitely, however—i.e. that they are liable for a share of defense costs incurred to date—it would be necessary to address the late-notice defense; the discussion which follows in the text is based on that premise.

against scores of dissimilarly situated defendants, and an equally non-specific PRP letter, so as to extend defense obligations to additional insurers despite Avondale's reasonable belief that Travelers was itself obligated to supply a full defense. While such an action would have benefitted Travelers financially, we do not believe that Avondale was obligated to take that action and impose on Highland and CU an obligation to defend in the face of Avondale's knowledge that there could be no duty to indemnify on their part.[15] Accordingly, we hold that Highlands and Commercial Union are not obligated to reimburse Travelers for any portion of the defense costs incurred to date.

D. Late Notice

AMICO and National Union each contend that Avondale's failure to timely inform it of the existence of pollution at the Site, and of the claims filed in the underlying actions, absolves it of any duty to defend or indemnify Avondale.

National Union's and AMICO's policies each provide:

In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and address of the injured and of available witnesses shall be given by or for the insured to [the insurer] as soon as practicable.[16]

If claim is made or suit is brought against the insured, the insured shall immediately forward to the [insurer] every demand, notice, summons or other process received by him or his representative.

(Sweet Affid., Ex. A at 1293; Monteleone Affid., Ex. A. at 2529, 10300.)

▇▇▇ An insured's duty to notify its insurer of an "occurrence" arises when "the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim" against the insured. *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 272 (2d Cir. 1987). Under New York law, compliance with a notice-of-occurrence provision is a condition precedent to an insurer's duty to provide coverage, *Id.* at 271, and failure to comply with the notice requirement relieves the insurer of its duty to defend and its duty to indemnify, even where there has been no showing that the insurer has been prejudiced by the delay. *Utica Mutual Ins. Co. v. Fireman's Fund Ins. Co.,* 748 F.2d 118, 121 (2d Cir.1984); *Security Mutual Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 440, 340 N.Y.S.2d 902, 905, 293 N.E.2d 76, 78 (1972); *Power Authority v. Westinghouse Elec. Corp.,* 117 A.D.2d 336, 339, 502 N.Y.S.2d 420, 422 (1st Dep't 1986).

It is undisputed that Avondale was on notice that it had been implicated in pollution at the Site no later than January 1986, when the Louisiana Attorney General sent Avondale the "potentially responsible party" letter. It is also undisputed that the underlying private actions arise out of the same occurrence as was brought to Avondale's attention in the PRP letter. *See New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1430 and n. 10 (2d Cir.1991); *Olin Corp. v. Ins. Co. of North America,* 743 F.Supp. 1044, 1054–55 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991) (per curium). Avondale first received notice of at least one of the private actions against it no later than August 1986. (August 20, 1986 letter from Robert Holden to Richard Reinga, attached as exhibit to October 31, 1990 letter from Paul McDonald to Court.) It is uncontroverted that Avondale notified AMICO and National Union of the occurrence and claims in mid-March 1987, at the

---

15. We note that it is of course not to be expected that this situation will arise often; an insured takes on a considerable risk when it decides not to pursue insurance coverage for claims which are within the four corners of the complaint and for which it could therefore conceivably be held liable.

16. The National Union policy provides "as soon as practicable after such notice has been received by the Director of Insurance of Ogden." ("of Avondale," in the 1985–86 policy)

earliest (Monteleone Affid., Ex F; Wildey Affid., Ex. A.), at about the time that Travelers served them with the third-party complaint in this action.

█ If no mitigating circumstances or reasonable explanation can be demonstrated, this fourteen month delay in notifying AMICO and National Union of the occurrence would typically entitle the insurers to judgment as a matter of law. *See Deso v. London & Lancashire Indem. Co. of America*, 3 N.Y.2d 127, 164 N.Y.S.2d 689, 143 N.E.2d 889 (1957) (51 day delay); *Whitney M. Young Health Center v. New York State Dep't of Insurance*, 152 A.D.2d 835, 543 N.Y.S.2d 768 (3d Dep't 1989) (unexplained five month delay unreasonable); *Eveready Ins. Co. v. Chavis*, 150 A.D.2d 332, 540 N.Y.S.2d 860 (2d Dep't 1989) (seven month delay from time insurer identifiable unreasonable); *Allstate Ins. Co. v. Moon*, 89 A.D.2d 804, 805, 453 N.Y.S.2d 467, 469 (4th Dep't 1982) (five month delay would be unreasonable as a matter of law, absent excuse); *L'Italia Provisions v. Interboro Mutual Indem. Ins. Co.*, 86 A.D.2d 888, 447 N.Y.S.2d 335 (2d Dep't) (fifty-four week delay in notice of occurrence untimely), *appeal denied*, 56 N.Y.2d 507, 453 N.Y.S.2d 1025, 438 N.E.2d 1147 (1982).

Travelers takes no position on the late notice issue (Travelers' Reply Mem. at 17), evidently counting on its ability to seek recovery from Avondale for damaging its subrogation rights, in the event that AMICO or National Union are excused from coverage because of Avondale's late notice.[17]

Avondale, however, has objected, albeit in cursory fashion, to the third-party defendants' assertion of the late-notice defense. Avondale contends that there is a jury question as to whether its delay in notifying the third-party defendants was reasonable and excusable. Avondale contends that its delay should be excused because it was due to its "belief based on its records that no material was sold to Combustion outside Traveler's [sic] policy periods...." (Avondale's Opp. Memo. of Law at 2 n. *.) Avondale cites *Kason v. City of New York*,

83 Misc.2d 810, 812, 373 N.Y.S.2d 456, 459 (Sup.Ct.N.Y.Co.1975) for the proposition that late notice may be excused where the insured "in good faith reasonably believes that there is no policy coverage...." (October 9, 1990 letter from Hugh Fryer to Court at 2.) Avondale contends that its bases for claiming excusable delay "are the very same circumstances on which third-party defendants rely on in the other branches of their motion, namely that plaintiffs shipped material to the Combustion site only during the period covered by Travelers insurance, that there was no occurrence during the third-party defendants' policy periods, [and] that the third-party defendants policies were not "triggered"...." (*Id.*)

█ Under New York law, notice must be given within a reasonable time under all the circumstances. *In re St. Clare's Hospital*, 934 F.2d 15, 19 (2d Cir.1991); *Eveready v. Chavis*, 150 A.D.2d at 332, 540 N.Y.S.2d at 861; *Jenkins v. Burgos*, 99 A.D.2d 217, 472 N.Y.S.2d 373, 375 (1st Dept.1984). Thus, where an insured offers an excuse or mitigating circumstances in an effort to explain the lateness of the notice, "[o]rdinarily, the reasonableness of any delay and the sufficiency of the excuse offered is a matter for trial." *Eveready* 150 A.D.2d at 333, 540 N.Y.S.2d at 861; *accord, Moon*, 89 A.D.2d at 805, 453 N.Y.S.2d at 469; *Jenkins*, 99 A.D.2d at 220, 472 N.Y.S.2d at 375. What is required is a "determination of what was within a reasonable time in the light of the facts and circumstances of the case at hand[,] ... [a] question[ ] whose answer[ is] heavily dependent on the factual context[ ] in which [it] arise[s] [and for which ] rules of general application are hard to come by." *Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 19–20, 416 N.Y.S.2d 559, 563, 389 N.E.2d 1080, 1084 (1979).

An example of a mitigating circumstance which has been recognized as potentially providing a valid excuse is the insured's reasonable belief that there is no insurance coverage available to cover any claim that

17. We express no opinion here as to whether such an attempt would be viable.

might arise out of the occurrence. *See Padavan v. Clemente*, 43 A.D.2d 729, 350 N.Y.S.2d 694 (2d Dep't 1973) (insured unaware that homeowner's insurance policy provided coverage for claims arising out of hunting accident) (cited in *Mighty Midgets*, 47 N.Y.2d at 20, 416 N.Y.S.2d at 563, 389 N.E.2d at 1083–84); *Kason v. City of New York*, 83 Misc.2d 810, 812, 373 N.Y.S.2d 456, 459 (Sup.Ct.N.Y.Co.1975); *Scala v. Scala*, 19 A.D.2d 559, 241 N.Y.S.2d 23 (2d Dep't 1963) (insured's lack of knowledge of coverage must be "justifiable" to excuse late notice).

■ It follows that where an insured has a reasonable belief, formed after an adequate investigation, that no claim arising out of the occurrence could fall within the coverage period of a particular insurer, a jury could find that the insured's late notice to that insurer was justifiable and excusable. The line of cases holding that late notice may be excused where the insured reasonably and in good faith believed that it faced no possibility of liability arising out of the occurrence, *e.g., Arch–Built Container Corp. v. Interboro Mutual Indem. Ins. Co.*, 119 A.D.2d 713, 501 N.Y.S.2d 127 (2d Dep't 1986); *Mobile Home Estates, Inc. v. Preferred Mutual Ins. Co.*, 105 A.D.2d 883, 482 N.Y.S.2d 355 (3d Dep't 1984); *Allstate v. Moon*, 89 A.D.2d at 805, 453 N.Y.S.2d at 469, also supports the conclusion that late notice to a particular insurer might be excused by an insured's reasonable and good faith belief that an occurrence could lead to no liability *that would be indemnifiable under that insurer's policies. See also Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 43 (2d Cir.1991) ("The test for determining whether notice of occurrence must be given to a particular insurer 'is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim [against that insurer].' ") (quoting *Commercial Union v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 272 (2d Cir. 1987), bracketed material supplied by *Og-*

*den* court).[18] While "an unexplained failure to exercise due diligence to ascertain coverage manifests failure to meet the notice requirements as a matter of law," *Young Health Center v. Dep't of Ins.*, 152 A.D.2d at 836, 543 N.Y.S.2d at 769, and an "insured may not, *without investigation*, gratuitously conclude that it need not ... report[ ] ... an accident ... which may fall within the coverage of an insurance policy," *Aetna Ca. & Surety Co. v. Lanza*, 70 A.D.2d 508, 509, 415 N.Y.S.2d 859, 860 (1st Dep't 1979) (emphasis added) (citing *Empire City Subway Co. v. Greater New York Mutual Ins. Co.*, 35 N.Y.2d 8, 13–14, 358 N.Y.S.2d 691, 694–95, 315 N.E.2d 755, 757–58 (1974)), the nature and adequacy of the insured's investigation is a matter to be explored at trial. *See Mobile Home Estates, Inc. v. Preferred Mutual Ins. Co.*, 105 A.D.2d at 884, 482 N.Y.S.2d at 356 (reasonableness of insured's belief that it faces no liability is affected by extent of inquiry conducted by insured into circumstances of the occurrence). We do not believe the record here permits a finding on summary judgment that Avondale's failure to notify AMICO was as a matter of law unreasonable or the product of inadequate investigation.

■ As to AMICO, we thus hold that there is a question of fact to be resolved at trial whether Avondale's delay in providing notice of the occurrence and claims was justifiable and excusable. There is evidence in the record which would support the inference that a diligent investigation by Avondale into its waste disposal practices could reasonably have concluded that Avondale had shipped no waste oil to the Site until after the end of AMICO's policy period. For example, David McBride, a witness designated by Avondale pursuant to Fed.R.Civ.P. 30(b)(6), has testified that neither a diligent search of all of Avondale's records, nor investigative personal interviews revealed any evidence that Avondale shipped waste to the Site during the AMICO policy period, and that the earliest document found concerning Avon-

18. The bracketed material added by the *Ogden* court, is undoubtedly intended to be read as "[against the insured that would be covered by that insurer]".

dale's waste oil disposal practices was a 1975 contract with Maysville Oil Company. (Levin Affid., Ex. C.)[19] Horace Bordelon, the superintendent of the Avondale gas free plant from 1975, has testified that no oil reclamation companies other than Maysville Oil picked up waste oil from the gas free plant before or after he became superintendent. (Dwyer Affid. Ex. L at 43.) Earl Dubose has testified that no Avondale waste oil was received at the Site prior to December 1976, or December 1987. (November 6, 1987 Dubose Affid. (Sweet Affid., Ex. M); January 21, 1989 Dubose depo (Sweet Affid., Ex N).)

This evidence of course does not by itself demonstrate that Avondale in fact conducted an adequate inquiry[20] or that its actions were reasonable, but it does permit the inference that a diligent investigation could have resulted in a reasonable and good faith belief that no shipments were made until after the AMICO policy period had ended. Indeed, even should the trier of fact find credible the testimony of a handful of former Dubose employees, located and deposed during extensive discovery in this action, that there were scattered pickups from Avondale in late 1974 or early 1975, such a finding would not necessarily foreclose a simultaneous finding that Avondale's determination that no such shipments occurred was reasonable and the product of adequate investigation.

 We are aware that an insured may not, as a general proposition, reserve to itself the decision as to which occurrences may spawn claims within the coverage of a policy, and which will not—that decision being the prerogative, in the first instance, of the insurer. *See Power Authority v. Westinghouse Elec. Corp.,* 117 A.D.2d 336, 340, 502 N.Y.S.2d 420, 422, (1st Dep't. 1986). The rather exceptional circumstances of this case, however, could give rise to a supportable finding by the trier of fact that Avondale, after proper investigation, had no reason to believe that the AMICO policy could be implicated. The underlying complaints contain undifferentiated allegations presented in an undefined scattershot approach against scores of defendants, including past and present Site owners, operators, transporters, and generators; we cannot say that as a matter of law it would necessarily have been unreasonable for Avondale to have disregarded allegations of tortious activity in the 1960s if it had a well-founded belief that those allegations were not directed, and did not apply, to it. *See, e.g., Lionel Freedman, Inc. v. Glens Falls Ins. Co.,* 27 N.Y.2d 364, 369, 318 N.Y.S.2d 303, 306, 267 N.E.2d 93, 95 (1971) (single patently groundless shot-gun allegation insufficient to invoke duty to defend); *Contracting Plumbers' Corp. v. Hartford Accident and Indem. Co.,* 59 A.D.2d 921, 399 N.Y.S.2d 255 (2d Dep't 1977), *aff'd,* 46 N.Y.2d 857, 414 N.Y.S.2d 515, 387 N.E.2d 226 (1979). Similarly, the PRP letter contains no information whatsoever concerning dates, leaving that determination, at least initially, to each PRP itself. In circumstances such as these, we see no reason why insureds with a well-grounded, good-faith belief that there is no basis for the insurer to indemnify, should be compelled to press into action an insurer as to which there is no realistic and foreseeable possibility of policy coverage.[21]

**19.** It is not completely clear from the record before us, but it appears that Avondale entered into a contract with Maysville dated July 14, 1986 for disposal of waste oil for a three year term commencing October 17, 1976 (1987 Ribner Affid., Ex. L), as well as an earlier contract with Maysville, dated some time in 1975. (*See* October 5, 1987 Affid. of R. Dean Church ¶ 6 (Dwyer Affid., Ex. F); depo. of Horace Bordelon at 45–46 (Dwyer Affid., Ex. L).) In any event, Maysville was not acquired by Combustion until well into the Travelers policy period.

**20.** Indeed, extracts from the deposition of Ronald Church, an Avondale Vice–President, suggest that Avondale may have difficulties in prevailing on this issue. (*See* Dwyer Affid., Ex. P.)

**21.** This situation is clearly distinguishable from those in *Heydt Contracting Corp. v. American Home Assurance Co.,* 146 A.D.2d 497, 499, 536 N.Y.S.2d 770, 772–73 (1st Dep't), *appeal dismissed,* 74 N.Y.2d 651, 542 N.Y.S.2d 520, 540 N.E.2d 715 (1989), and *Gardner–Denver Co. v. Dic–Underhill Const. Co.,* 416 F.Supp. 934, 937 (S.D.N.Y.1976), in each of which the insured simply elected to claim under another parties' insurance for a first-party property loss, and had no basis to believe that its own insurance was not also liable for indemnification.

It is true that AMICO's duty to *defend* was obvious on the face of the complaints, if not the PRP letter, based on the "from the mid–1960s" allegations of those complaints, and Avondale therefore must have been aware that it could invoke AMICO's policies. In this case, however, the practical effect of a ruling that the late notice is inexcusable because the duty to defend was obvious, would be to invite Travelers to seek to impose at least some of the defense costs on Avondale itself. In such a circumstance, we decline, for the reasons discussed above in Section I(C)(3), to risk penalizing an insured and rewarding its insurer for the insured's decision not to take full advantage of the four corners rule. As discussed above, we do not believe the four corners rule was intended to be applied for the benefit of the insurer and to the detriment of the insured. Accordingly, we hold that a triable issue exists whether Avondale's late notice to AMICO was reasonable.[22]

With respect to National Union, however, Avondale's delay may not be excused. The National Union policy defines "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." (Monteleone Affid., Ex. A at 10299.) There was ample authority existing by early 1986 for the propositions that bodily injury "occurs" for purposes of triggering insurance coverage, at the time there is an "injury-in-fact," *American Home Products Corp. v. Liberty Mutual Ins.*, 748 F.2d 760, 764–66 (2d Cir.1984) (applying New York law); *Sandoz, Inc. v. Employer's Liability Assurance Corp.*, 554 F.Supp. 257, 263–66 (D.N.J.1983) (applying N.J. law), or at the time an injury manifests itself, *e.g.*, *Eagle–Picher Industries, Inc. v. Liberty Mutual Ins. Co.*, 682 F.2d 12 (1st Cir.1982), *cert.*

*denied*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983); *Emons Industries, Inc., v. Liberty Mutual Fire Ins. Co.*, 567 F.Supp. 335, 339 (S.D.N.Y.1983) (under New York law manifestation rule may apply); *Hartford Accident & Indemnity Co. v. Aetna Life & Cas. Ins. Co.*, 98 N.J. 18, 483 A.2d 402, 410 (1984); *American Motorists Ins. Co. v. E.R. Squibb & Sons, Inc.*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct. N.Y.Co.1978), or even during the time that a toxic substance is resident in the body, *e.g.*, *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1045–46 (D.C.Cir. 1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); *Lac D'Amiante du Quebec, Ltee. v. American Home Assurance Co.*, 613 F.Supp. 1549, 1558 (D.N.J.1985) (applying N.J. law), *vacated on other grounds*, 864 F.2d 1033 (3d Cir. 1988). Given this authority, it would have been unreasonable, as a matter of law, for Avondale to have concluded that there was no possibility of a claim against it based on an injury resulting from pollution at the Site and "occurring" during National Union's policy period. It is not reasonable for a sophisticated purchaser of insurance such as Avondale to have been unaware that bodily injury can "occur," for coverage purposes, years after the shipment of waste or its escape into the environment, and Avondale's late notice of occurrence therefore is unexcused as to National Union.

As subrogee of Avondale, Travelers' claims against National Union are subject to whatever defenses National Union might have against a claim for coverage from Avondale. *H.S. Equities, Inc. v. Hartford Accident & Indem. Co.*, 661 F.2d 264, 271 (2d Cir.1981); *Great American Ins. Co. v. United States*, 575 F.2d 1031, 1034 (2d Cir.1978); *Servidori v. Mahoney*, 129 A.D.2d 944, 945, 515 N.Y.S.2d 328, 329 (3d Dep't 1987).[23] Avondale's late notice of

22. We also note the possibility that AMICO may have waived a late notice of occurrence defense by failing to mention it in a list of other reasons for denying coverage. (*See* April 8, 1987 letters from R.E. Widley of AMICO to R. Dean Church, attached to November 12, 1987 letter from Hugh Freyer to Court.) *See New York v. AMRO*, 936 F.2d at 1431–32.

23. The parties' decision not to raise or brief the issue (and Travelers' statement that it takes no position on late notice), forecloses the need to consider at this time whether Traveler might be entitled to equitable indemnification or contribution from National Union without regard to National Union's defenses against Avondale. *See Cosmopolitan Mutual Ins. Co. v. Lumber-*

occurrence would relieve National Union of its coverage obligations should Avondale seek insurance coverage from it for any of the underlying actions at issue here, and hence entitles National Union to summary judgment in this action.

### E. Trigger of Coverage for Property Damage

AMICO contends that it has no duty to defend or indemnify Avondale in connection with property damage claims, including the LADEQ proceeding, because no property damage "occurr[ed] during the policy period," as required by AMICO's policies. AMICO argues for application of the "first manifestation" rule, which holds that property damage "occurs" for purposes of determining insurance coverage at the time the damage first manifests itself, regardless of whether damage in fact took place at an earlier date, or continued through a later date.[24] AMICO further contends that the "pollution condition" at the Site was first "discovered" no earlier than May 1, 1981, when the federal EPA prepared a "Potential Hazardous Waste Site Identification and Preliminary Assess-

ment" report. (AMICO Mem. at 9–11, 25; Sweet Affid. Ex. C.)

We need not now decide whether the "first manifestation" approach is the correct one under New York law, or, if it is, its precise contours. There is evidence in the record before us of repeated oil spills and resultant contamination at the Site and neighboring areas as far back as February 1974.[25] Accordingly, AMICO cannot demonstrate to a certainty that it will be absolved from the duty to indemnify, even were we to apply the "first manifestation" trigger theory, and is thus not entitled to a declaration that it has no duty to defend the property damage claims. Further, because the issue of the first manifestation of property damage might well be an issue addressed and resolved in the underlying action in connection with the statute of limitations defense raised by Avondale in the underlying actions (see Avondale Answer in *Campo, et al. v. Dubose, et al.* at ¶ 11 (September 1990 Ribner Affid., Ex. C) (asserting statute of limitations as an affirmative defense)), we believe it would be inappropriate to attempt to resolve it here,[26] even if the inadequate record and

---

*mens' Mutual Cas. Co.,* 20 N.Y.2d 145, 153, 281 N.Y.S.2d 993, 996, 228 N.E.2d 893, 895 (1967) (insured may not release one of two coinsurers from liability without consent of other coinsurer); *see also, Great American Ins. Co.,* 575 F.2d at 1034–35 (distinguishing between subrogation rights and implied action for indemnification). We note that Travelers' failure itself to timely notify National Union of the occurrence or claims might hinder such an approach.

**24.** In support of this proposition, AMICO cites *Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325, 1328 (4th Cir.1986); *American Home Assurance Co. v. Libbey-Owens-Ford Co.,* 786 F.2d 22, 30 (1st Cir.1986); *American Motorists Ins. Co. v. Levelor Lorentzen, Inc.,* No 88–1994 (1988 WL 112142) (D.N.J. Oct. 14 1988) (applying New York law), *aff'd,* 932 F.2d 958 (3d Cir.1991), and other cases.

**25.** A May 21, 1975 internal memorandum of the Louisiana Wildlife and Fisheries Commission, Division of Water Pollution Control (Monteleone Affid., Ex. P), lists some thirteen complaints, investigations, and inspections between February 8, 1974 and May 16, 1975, many of them revealing oil spills in ditches, streams, and a canal, on or in the vicinity of the Site. The memo refers to the "almost constant discharge of oil wastes from this company for some time,"

and notes that "the stream which drains the storage pit area has remained full of oil and this oil escapes the area during rainfall," and that in a nearby canal, "the banks are still oil covered as is the water that stands in the canal." The memo concludes, "[n]ow that a bona fide discharge exists at this operation, th[e] canal should be cleaned up immediately...." Even though a later memo, dated October 11, 1976 (Monteleone Affid., Ex. P), states that, as to certain types of discharge, "the conditions cannot be entirely related to discharges from Dubose Trucking Company as has been previously reported," there is sufficient evidence that property damage manifested itself during AMICO's policy period. AMICO's attempt (AMICO Mem. at 9 n. 10) to downplay this evidence as unrelated to the "pollution condition" which is the subject of the underlying actions is unconvincing; we can not conclude as a matter of law on this record that frequent and repeated discharges of oil from the Site into the surrounding environment were not manifestations of relevant property damage.

**26.** We express no opinion on the extent to which any statute of limitations issues overlap with the insurance "trigger" issue, or to what extent a holding on one issue would be determinative of the other.

briefing before us on the trigger issue were more complete.

### F. "Other Insurance" Clauses

Although each of the insurers' policies at issue here was written as primary liability insurance, each policy contains an "other insurance" clause, designed to order coverage obligations in the event that more than one insurer's policy covers a particular loss or occurrence. AMICO's "other insurance" clause provides:

> The insurance afforded by the policy is primary insurance, except that when this insurance and any other valid and collectible insurance apply to the loss on the same basis, this insurance shall be excess of such other insurance and shall not contribute with such other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis[,] the amount of [AMICO's] liability under this policy shall not be reduced by the existence of such other insurance.

1990 Ribner Affid., Ex. F at 500575.

The Travelers "other insurance" clause provides:

> This insurance is primary with respect to any other liability insurance available to the insured if such other insurance was purchased by and issued to the named insured specifically to apply in excess hereof. This insurance shall apply in excess of all other liability insurance available to the insured.... Without waiving the foregoing, if any insurer affording other insurance to the named insured denies primary liability under its policy, [Travelers] will respond under this policy as though such other insurance were not available, provided that [Travelers] shall be subrogated to all rights of the insured to such other insurance and the insured shall do all things necessary to enforce such rights.

October 28, 1987 Carroll Affid., Ex. G at 6374.

It is clear that the "other insurance" clauses of both Travelers and AMICO are of the "excess" type—unambiguously contemplating that each will be excess insurance as to all but "true" excess policies. Under New York law, "an insurance policy which purports to be excess coverage but contemplates contribution with other excess policies or does not by the language used negate that possibility" is primary to "a policy which expressly negates contribution with other carriers, or otherwise manifests that it is intended to be excess over other excess policies." *State Farm Fire & Cas. Co. v. LiMauro*, 65 N.Y.2d 369, 375–76, 492 N.Y.S.2d 534, 539, 482 N.E.2d 13, 18 (1985). We have no trouble in concluding that each of the policies under consideration "manifests that it is intended to be excess over other excess policies" and "negates th[e] possibility" that it will contribute with other excess policies.

Travelers, however, contends that because AMICO's clause makes its coverage excess only when it and the other insurance "apply to the loss on the same basis," while Travelers' clause makes coverage excess in all events, AMICO's coverage is primary to Travelers'. Conversely, AMICO points to the "drop down" provision of Travelers' clause as proof that the Travelers policy "does not ... negate the possibility" that it might provide primary insurance, and therefore is primary to AMICO policy.

■ These contentions are meritless. As to the AMICO clause, the AMICO and Travelers policies do "apply to the loss on the same basis." They are both written to provide primary liability insurance and both attempt to foist onto other carriers primary liability when more than one insurer covers the loss. Similarly, Travelers' "drop down" provision does not indicate an intent by Travelers to abandon its pose as an excess insurer. Rather it is an accommodation to its insured in the event that other insurers wrongfully decline coverage, and expressly contemplates Travelers' efforts to force other insurers to fulfill their contractual responsibilities at the level called for by the interaction of the various policies' "other insurance" clauses. Thus, where the other policy's "other insurance" clause contemplates primary coverage, Travelers would ultimately stand in the

position of an excess insurer and be completely reimbursed. The drop down provision does not alter Travelers' professed position as an excess insurer, it merely obligates Travelers temporarily to cover its insured pending resolution of coverage disputes among the insurers. The relevant "other insurance" clauses are thus, for practical purposes, identical, and stand on equal footing as "excess" clauses. *See, e.g., Continental Ins. Co. v. Commercial Union Ins. Co.,* 27 A.D.2d 333, 336, 278 N.Y.S.2d 995, 998 (1st Dep't 1967).

Under New York law, where the policies of two primary liability insurers each apply to an occurrence, and when both polices contain "excess" "other insurance" clauses, "the 'excess' clauses operate to cancel out each other, both coverages must be treated as primary and each company is obligated to share in the cost of the settlement [of the underlying action] and the expenses." *Federal Ins. Co. v. Atlantic National Ins. Co.,* 25 N.Y.2d 71, 75–76, 302 N.Y.S.2d 769, 771, 250 N.E.2d 193, 194–95 (1969); *accord, State Farm v. LiMauro,* 65 N.Y.2d at 374, 492 N.Y.S.2d at 538 ("excess coverage clauses are deemed to cancel each other out and each carrier is required to contribute ratably in such proportion as its policy limit bears to the total of all policy limits"); *Continental Ins. Co. v. Commercial Union Ins. Co.,* 27 A.D.2d at 336–37, 278 N.Y.S.2d at 998 (same). The insurers' contribution to the payment of the cost of the defense of the underlying action is determined on a pro rata basis according to the policy limits of the policies at issue. *Federal Ins. v. Atlantic Ins.,* 25 N.Y.2d at 78–79, 302 N.Y.S.2d at 774, 250 N.E.2d at 196 (citing *Lamb–Weston, Inc. v. Oregon Automobile Ins. Co.,* 219 Ore. 110, 130, 346 P.2d 643 (1959); *Continental Cas. Co. v. Buckeye Union Cas. Co.,* 143 N.E.2d 169, 180 (Ohio Ct.Comm.Pleas 1957), and distin-

guishing *Cosmopolitan Mutual Ins. Co. v. Continental Cas. Co.,* 28 N.J. 554, 147 A.2d 529, 534–35 (1959) (insurers' liability apportioned equally)); *Atlantic Mutual Ins. Co. v. Atlantic National Ins. Co.,* 38 A.D.2d 517, 326 N.Y.S.2d 438 (1st Dep't 1971) (defense and indemnity costs allocated pro rata where excess clauses cancelled each other out), *aff'd,* 33 N.Y.2d 817, 350 N.Y.S.2d 909, 305 N.E.2d 917 (1973). Thus here, AMICO and Travelers must contribute on a pro rata basis to the costs of Avondale's defense of the underlying actions.[27]

Travelers contends that *Federal Ins. Co. v. Cablevision Systems Development Co.,* 836 F.2d 54 (2d Cir.1987), requires that defense costs here should be apportioned equally between the insurers, not on a pro rata basis. We do not agree. In *Cablevision,* the three insurers' policies all contained identical "other insurance" clauses which provided for division of indemnity costs in equal shares. *Id.* at 58. The court affirmed the district court's conclusion that the presence of the "equal share" other insurance clauses indicated an intent of the coinsurers that their contributions to defense costs should be by equal shares. *Id.* Here, by contrast, there is no indication of an intent to apportion liability or defense costs either by equal shares, as in *Cablevision,* or pro rata. The pro rata apportionment is called for by operation of law when "excess" clauses cancel each other out, and applies both to indemnification and defense costs. *Federal Ins. Co. v. Atlantic National Ins. Co.,* 25 N.Y.2d at 75–76, 78–79, 302 N.Y.S.2d at 771, 774, 250 N.E.2d at 194–95, 196; *Atlantic Mutual v. Atlantic National,* 38 A.D.2d 517, 326 N.Y.S.2d 438.

It is true that the *Cablevision* court sets out an independent basis for its decision:

---

27. We need not, at this juncture, decide whether the National Union policy would be "available insurance" as to the LADEQ proceeding or the private actions or both, had NU received timely notice from Avondale. We also express no opinion as to whether National Union's contribution, had NU remained in this action, would be calculated pro rata, along with AMICO's and Travelers', according to policy limits. While the

NU policy appears to be a primary liability policy with a "pure" "excess" clause (Monteleone Affid., Ex. A at 2573), identical for our purposes to AMICO's and Travelers' policies, it may well be that the NU policy, in actuality, was designed and functioned as an excess policy, due to the effect of Avondale's "fronting agreement" with NU. (September 19, 1990 Freyer Affid.)

because "the duty of each of the ... insurers to defend ... is separate and equal," and because "the insurers cannot defend 'part' " of the underlying action, "it is logical that the insurers bear the costs of defense equally." *Id.* at 58. We are inclined to read that rationale as non-binding dicta in a situation such as this one, where indemnification would be apportioned on a pro rata basis. We do not believe that the Second Circuit would find it "logical" to divide defense costs equally where indemnification costs would be divided on a prorata basis—nor is that approach open under existing New York law.

Further, the cases cited by the *Cablevision* court in its discussion of this approach do not support its application in the situation here. *Allstate Ins. Co. v. Aetna Casualty & Surety Co.*, 123 Misc.2d 932, 475 N.Y.S.2d 219 (Sup.Ct.Sull.Co.1984), is inapposite, dealing with the insurers' liability for the defense costs of its insured incurred in defending the *coverage* action brought by the insurers, not with the defense costs of defending the underlying action. That it makes sense to divide equally between the unsuccessful insurer-plaintiffs the former costs, imposed as damages for breach of the insurance contract, (there being no basis to apportion between the insurers the costs incurred by the insured in defending the coverage action against two insurer-plaintiffs), does not mean that where the insurers are paying out sums for the underlying defense, as part of their coverage obligation, that apportionment of defense costs should not follow apportionment of indemnification liability.

*Atlantic Mutual Ins. Co. v. Truck Ins. Exchange*, 797 F.2d 1288, 1296 n. 6 (5th Cir.1986) (applying New York law), cited by *Cablevision*, held without further discussion that although two insurers were required to indemnify on a pro rata basis, because they "had equal obligations to defend [their insured], defense costs should be apportioned equally between them." (citing *Emons Industries Inc. v. Liberty Mutual Fire Ins. Co.*, 481 F.Supp. 1022, 1027 (S.D.N.Y.1979) and *Allstate Ins. Co.*

*v. Aetna Cas., supra* ). Whatever the merits of the truism that because two insurers both have a "separate and equal" duty to defend, the dollar amounts for which they are liable when they are sharing the costs should be equal, we do not believe that result is compelled where indemnity costs are being split on a pro rata basis. The issue of whether two parties are each individually liable to a third party for the full amount of damages is distinct from how the dollar amount of damages should be apportioned between the two when both are contributing. While equal apportionment of defense costs is rational when indemnification liability is equally apportioned, it is not obvious that equal apportionment is logical when indemnification would be apportioned on a pro rata basis. On the contrary, the more workable and equitable approach would be for apportionment of defense costs to follow the method for apportionment of indemnification costs. As Travelers has argued in a different setting, "[d]efense dollars protect indemnity dollars." (Dwyer Affid., Ex. T at 6.) In the absence of a binding legal rationale or a compelling logical one, we see no reason to encourage even greater complexity and confusion in multiple insurer coverage litigation by applying to one dispute between the same insurers different apportionment rules for indemnification payments and defense costs

In any event, it appears that *Federal Insurance Co. v. Atlantic* remains good law and controls the situation here. While *Cablevision* implies that *Federal* is inapposite to this situation because one of the policies in that case provided for pro rata apportionment of indemnity costs, 836 F.2d at 59, the criticism is misplaced. The applicable clause of the policy at issue was an "excess" clause, 25 N.Y.2d at 75, 302 N.Y.S.2d at 771, 250 N.E.2d at 194, and indeed the *Federal Insurance* court expressly grounded its holding on the rule that where two excess clauses clash, they cancel each other out, and apportionment is pro rata. We also note that *Emons Industries Inc. v. Liberty Mutual Fire Ins. Co.*, 481 F.Supp. 1022, 1026–27 (S.D.N.Y.1979), cited both by *Cablevision* and *Truck In-*

**1438**

*surance,* which seems to adopt the "equal obligation to defend, therefore equal dollar contribution" rationale, includes an ambiguous amended opinion which orders contribution to defense costs by "pro-rata share." *Id.* at 1028. Finally we note that *Continental Casualty Co. v. Aetna Cas. and Surety Co.,* 823 F.2d 708 (2d Cir.1987), applying "the better reasoned rule", *id.* at 711, where no relevant Connecticut law (the applicable law) existed, held that "[w]here 'each insurer has attempted to make his coverage "excess" ... [t]he courts ... will require the insurers, in the ordinary instance, to prorate the loss.'" *Id.* (citations omitted).[28] Significantly, the *Cablevision* panel distinguished *Continental Casualty* not on the basis that it applied Connecticut law contrary to New York law, and not on the basis that *Continental Casualty* dealt only with indemnity payments, not defense costs. Rather *Cablevision* distinguished the earlier case solely on the basis that there none of the "other insurance" clauses referred to equal contributions, while the policies in *Cablevision* expressly provided for equal contribution apportionment. The "other insurance" clauses in issue here place the instant case within the relevant factual context of *Continental Casualty,* not *Cablevision,* and we do not think that *Cablevision,* by its own terms, applies here.

III. *Conclusion*

For the foregoing reasons:

(1) The motions of Commercial Union and Highlands for summary judgment are granted, and the third-party complaint against them is dismissed;

(2) The motion of National Union for summary judgment is granted, and the third-party complaint against it is dismissed.

(3) The motion of Travelers for partial summary judgment is granted as to AMI-

CO in part, and AMICO's motion for summary judgment is denied; Travelers and AMICO are obligated to contribute on a pro-rata basis, determined according to their respective policy limits, to the costs of Avondale's defense in the underlying actions.

SO ORDERED.

---

**28.** The court went on to hold that under Connecticut law, pro-rata apportionment is based on total policy limits. 823 F.2d at 712. *See also Argonaut Ins. Companies v. Medical Liability Mutual Ins.,* 760 F.Supp. 1078, 1085–86 (S.D.N.Y.1991) (applying New York law) (where both insurers' "other insurance" clauses call for

pro rata apportionment, defense costs should be apportioned pro rata according to policy limit of liability, but number of years on the risk is irrelevant for pro rata determination); *State Farm v. LiMauro,* 65 N.Y.2d at 374, 492 N.Y.S.2d at 538.