363 F.3d 137
 INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff-Counter-Defendant-Appellee,
v.
LIBERTY MUTUAL INSURANCE COMPANY and Liberty Mutual Fire Insurance Company, Defendants-Counter-Claimants-Appellants,
Zurich Insurance Company, Defendant-Appellee.
 Docket No. 03-7237.
 United States Court of Appeals, Second Circuit.
 Argued: October 16, 2003.
 Decided: March 19, 2004.
 
 COPYRIGHT MATERIAL OMITTED Joseph G. Blute, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, Massachusetts, (Jaffe & Asher LLP, New York, New York, on the brief) for Appellants.
 Thomas H. Sear (Mark R. Seiden, Howard F. Sidman, on the brief), Jones Day, New York, New York for Appellee, International Business Machines Corp.
 Thomas W. Queen (Thomas W. Brunner, Alysa B. Wakin, on the brief), Wiley Rein & Fielding, LLP, Washington, DC, (John H. Eickemeyer, Vedder, Price, Kaufman & Kammholz, P.C., New York, New York, on the brief) for Appellee, Zurich Insurance Co.
 Before: OAKES, JACOBS and POOLER, Circuit Judges.
 JACOBS, Circuit Judge.
 
 
 1
 At issue on this appeal is the duty of defendants-appellants Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company (together, "Liberty Mutual") to defend International Business Machines ("IBM") in toxic tort suits commenced by IBM employees who allege that they contracted cancer by working in IBM's California "cleanroom" facilities. After the California court dismissed some of the claims and Liberty Mutual disclaimed coverage for intentional torts, Liberty Mutual terminated its ongoing defense of IBM on the ground that all the claims remaining were the subject of a stipulation (compelled by a wrinkle in California's workers compensation law) that limited any potential recovery to personal injury suffered prior to January 1, 1983 — a policy year which no longer provided coverage for such claims.
 
 
 2
 In a nutshell, Liberty Mutual disclaimed on the grounds that the trigger of coverage in the relevant policy years was a claimant's last day of last exposure to cleanroom conditions at IBM; that by virtue of the stipulation, the 1982 insurance contract is the one that was in force on the last day of last exposure for which damages are now being claimed and is therefore the only contract triggered; that the 1982 contract excludes claims for bodily injury by disease unless the resultant claim or suit was brought within three years after the end of the policy period; and that none of the underlying suits were commenced within that time.
 
 
 3
 In response, IBM argues that Liberty Mutual owes a duty to defend each claim under the policy in force on each claimant's last day of exposure to a cleanroom; that absent evidence to the contrary, the last day of exposure is a plaintiff's last day of employment with IBM; that the stipulation does not allege or set the plaintiffs' last day of exposure to the California cleanrooms; and that the last date of employment specified by plaintiffs in interrogatories (ranging from 1977 to 1999) arguably implicates coverage under subsequent insurance policies that contain no claims-made exclusion.
 
 
 4
 The United States District Court for the Southern District of New York (Brieant, J.) ruled that New York law governs this insurance question (rather than the law of California); and that the last day of last exposure or employment is a question of fact that is not controlled by the stipulation. The court therefore declared that Liberty Mutual had a continuing duty to defend the claims for negligence and strict liability.
 
 
 5
 On appeal, Liberty Mutual challenges the district court's choice of law and its declaration. We conclude that New York law and California law present a false conflict, and we affirm the declaratory judgment. We therefore necessarily affirm the district court's holding that the Liberty Mutual policies require Liberty Mutual to defend IBM against claims of minor plaintiffs in the same toxic tort litigations.
 
 BACKGROUND
 
 6
 The facts recounted in this opinion are those that bear upon the issues decided in this appeal, and those that supply necessary context.
 
 
 7
 Annually from the 1960s through at least 1999, Liberty Mutual wrote employers liability and workers compensation coverage for IBM's California manufacturing facilities.[1]
 
 
 8
 The form and wording of the insurance contracts has changed three times since 1976, though with a couple of exceptions the substantive policy provisions have been unchanged.
 
 
 9
 Beginning in April 1998, dozens of current and former IBM employees brought six "toxic tort" actions against the company alleging, inter alia, injuries caused by exposure to chemicals in IBM's San Jose "cleanrooms." A cleanroom is a "room in which the concentration of airborne particles is controlled[.]" Federal Standard 209E § 3.5 (Institute of Environmental Sciences, 1992, appv'd by U.S. General Services Administration). IBM uses cleanrooms for the manufacture of hard drives and other sensitive computer components.
 
 
 10
 The California actions alleged eight common claims for: (i) negligence, (ii) strict liability, (iii) ultra-hazardous strict liability, (iv) fraud, (v) intentional and (vi) negligent breach of California Labor Code § 3602(b)(2) (the "California Labor Code"), (vii) post-employment negligent failure to warn and (viii) post-employment intentional concealment of hazards. Two California actions, Barron v. IBM ("Barron") and Gomez v. IBM ("Gomez"), include claims asserted by and on behalf of minor plaintiffs David Hecksel and Malissa Garcia (collectively, the "minor plaintiffs").
 
 
 11
 IBM first gave notice of the claims in May 1998; eventually, Liberty Mutual shouldered the defense. In its several reservation of rights letters, Liberty Mutual disclaimed coverage for several of the eight claims for various reasons (and disclaimed as to all claims brought on behalf of the minor plaintiffs). Eventually, Liberty Mutual disclaimed altogether its duty to continue the ongoing defense, on the ground that no claim could result in a covered loss.
 
 
 12
 From the outset, Liberty Mutual disclaimed coverage for the three claims pleading intentional wrongs (fraud, intentional breach of § 3602 and post-employment intentional concealment of hazards) on the ground that coverage is defeated by, inter alia, an Intentional Act Exclusion and California Insurance Code § 533. That disclaimer is not at issue on this appeal.
 
 
 13
 In rulings issued in September and December 1999, the California Superior Court dismissed three of the eight claims: ultra-hazardous strict liability, negligent breach of the California Labor Code, and post-employment negligent failure to warn. IBM does not predicate its claim for defense upon the dismissed claims.
 
 
 14
 IBM's claim to a defense rests upon the two remaining claims: negligence and strict liability. Liberty Mutual argues that those two claims do not support a duty to defend because a stipulation between IBM and the California plaintiffs, dated November 17, 1998, operated (as described below) to preclude insurance coverage by Liberty Mutual for the negligence and strict liability claims asserted by the underlying plaintiffs. Among other things, the stipulation limited the scope of plaintiffs' claims for negligence and strict liability to injury suffered as a result of cleanroom exposure prior to January 1, 1983.
 
 
 15
 In April 2000, Liberty Mutual therefore advised IBM that its duty to defend ended on December 14, 1999.
 
 
 16
 On July 24, 2000, IBM filed a complaint against Liberty Mutual and Zurich seeking, inter alia, damages incurred by the insurers' refusals to defend the California actions, and a declaratory judgment requiring Liberty Mutual and/or Zurich to continue to pay the cost of defense. Following discovery, Liberty Mutual moved for partial summary judgment on the ground that, as a matter of law, it had no duty to continue its defense of the California actions after December 14, 1999. Essentially, Liberty Mutual argued that: (i) by that date (because of the 1998 stipulation and 1999 dismissals of certain claims), the only coverage that could be triggered by the remaining claims for negligence and strict liability was the 1982 contract; (ii) the 1982 contract did not apply to claims filed after December 31, 1985; and (iii) none of the California actions was filed by that date. Liberty Mutual additionally disclaimed a duty to defend against the minor plaintiffs' claims in the Barron and Gomez actions — a position it has maintained since announcing its initial coverage positions in July 1999.
 
 
 17
 IBM opposed the motion and cross-moved for summary judgment on the ground that, as a matter of law, Liberty Mutual had a continuing duty to defend against the California actions. IBM argued that Liberty Mutual's policies are triggered on an employee-plaintiff's "last day of last exposure" to a San Jose cleanroom; that the 1999 dismissals left standing the underlying claims of negligence and strict liability; that the 1998 stipulation between IBM and the California plaintiffs had no bearing on the trigger of coverage for those claims; and that Liberty Mutual's duty to defend against the California actions (including the claims of minor plaintiffs) therefore continued after December 14, 1999. Zurich moved for an order requiring Liberty Mutual to defend IBM against minor plaintiffs' claims in the Barron and Gomez actions.
 
 
 18
 The district court granted IBM's motion, and declared that Liberty Mutual's duty to defend the California actions continued after December 14, 1999. Before reaching the merits, the district court concluded — applying "grouping of contacts" analysis — that New York law governed this dispute. The court then rejected Liberty Mutual's contention that the 1998 stipulation terminated its defense obligations with respect to the California actions and held that, based on "clear, unambiguous" policy language, Liberty Mutual's policies are "in all instances ... triggered by the last day of last exposure to the conditions allegedly causing or aggravating bodily injury ..."
 
 
 19
 The district court made no finding as to the "last day of last exposure" for each California plaintiff, but noted that setting the particular day was a "factual determination" which, "in the absence of other evidence is the last day of employment of each plaintiff." The court noted that each plaintiff's "last day of last exposure" might ultimately be resolved between the parties or by a trier of fact; but it is clear that, in the district court's view, the 1998 stipulation did not affect the policies' trigger mechanism, or the factual determination upon which its operation is predicated. Finally, as to Zurich's motion for an order requiring Liberty Mutual to defend IBM against the minor plaintiffs' claims, the district court ruled that the issue was "subsumed" by its determinations that (i) New York law governed this dispute and (ii) that Liberty Mutual had a duty to defend the California actions beyond December 14, 1999.
 
 DISCUSSION
 
 20
 On appeal, Liberty Mutual challenges the district court's rulings [i] that New York law governs this dispute; [ii] that Liberty Mutual's duty to defend IBM against the California actions continued after December 14, 1999; and [iii] that Liberty Mutual owed a duty to defend IBM against the claims of minor plaintiffs in the Barron and Gomez actions. We conclude [i] that there is no conflict between New York and California law with respect to the scope of Liberty Mutual's duty to defend IBM; [ii] that the trigger of liability coverage is the last date of each tort plaintiff's exposure to the cause of injury (while employed by IBM) notwithstanding the stipulation in the underlying litigation that withdrew any claim for damages and any claim of wrongdoing after December 31, 1982 — a date after which many tort plaintiffs' exposure appears to have long continued; and [iii] that Liberty Mutual has an ongoing duty to defend IBM against minor plaintiffs' claims in the Barron and Gomez actions.
 
 
 21
 We review a district court's grant of summary judgment de novo. Mt. Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d. Cir.2002). Summary judgment is appropriate if "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Liberty Mutual and IBM both moved for summary judgment.
 
 
 22
 * Federal courts sitting in diversity look to the choice-of-law rules of the forum state. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir.1998). On appeal, Liberty Mutual challenges the district court's conclusion that a New York court would apply New York law to this dispute. A district court's choice of law determination is reviewed de novo. Id. at 11. If the law of more than one jurisdiction is potentially applicable to a contract dispute, New York courts undertake "grouping of contacts" analysis to determine the governing law. Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994). The court endeavors to apply the law of the jurisdiction having the "most significant relationship to the transaction and parties." See Id. After considering the multiple contacts between this dispute and both New York and California, Judge Brieant concluded that the New York contacts were stronger than those of California and applied New York law. Liberty Mutual contests this ruling, chiefly on the ground that when resolving choice of law questions involving insurance contracts, New York courts often give decisive weight to the location of an insured risk (here, California).
 
 
 23
 Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict. In re Allstate Ins. Co. ("Stolarz"), 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). Laws are in conflict "[w]here the applicable law from each jurisdiction provides different substantive rules." Curley, 153 F.3d at 12 (citing examples). In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it. See, e.g., J. Aron & Co. v. Chown, 231 A.D.2d 426, 647 N.Y.S.2d 8 (N.Y.App.Div.1996) (affirming application of New York law where there was no actual conflict with the substantive law of Newfoundland); Tronlone v. Lac d'Amiante Du Quebec, 297 A.D.2d 528, 528, 747 N.Y.S.2d 79 (2002), aff'd 99 N.Y.2d 647, 760 N.Y.S.2d 96, 790 N.E.2d 269 (2003) (affirming application of New York law where there was "no relevant conflict" between the substantive laws of New York and New Jersey).
 
 
 24
 As the discussion that follows demonstrates, there is no conflict between New York and California on the principles of insurance law that decide this appeal. Absent such a conflict, the district court's application of New York law was not error.
 
 II
 
 25
 An insurer's duty to defend claims made against its policyholder is ordinarily ascertained by comparing the allegations of a complaint with the wording of the insurance contract. Horace Mann Ins. Co. v. Barbara B., 4 Cal.4th 1076, 17 Cal.Rptr.2d 210, 846 P.2d 792, 795 (1993) (in banc); Ruder & Finn Inc. v. Seaboard Sur. Co., 52 N.Y.2d 663, 669, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981). "[T]he initial interpretation of a contract is a matter of law for the courts to decide," Morgan Stanley Group, Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir.2000) (internal quotation marks omitted); see also Lombardo v. Santa Monica Young Men's Christian Ass'n., 169 Cal.App.3d 529, 215 Cal.Rptr. 224, 230 (1985), and if the wording on the duty to defend is clear and unambiguous, it will be enforced according to its terms. La Jolla Beach and Tennis Club, Inc. v. Indus. Indem. Co., 9 Cal.4th 27, 36 Cal.Rptr.2d 100, 884 P.2d 1048, 1053 (1995) (in banc); U.S. Fidelity & Guar. Co. v. Annunziata, 67 N.Y.2d 229, 232, 501 N.Y.S.2d 790, 492 N.E.2d 1206 (1986). The goal is always to give effect to the intent of the parties, as embodied in their written agreement. La Jolla, 36 Cal. Rptr.2d 100, 884 P.2d at 1053; Mt. Vernon, 277 F.3d at 236-37. See also McGrail v. Equitable Life Assur. Soc. of the U.S., 292 N.Y. 419, 424-25, 55 N.E.2d 483 (1944). In reading the text, a potent background principle is that the duty to defend is broader than the duty to indemnify. Horace Mann, 17 Cal.Rptr.2d 210, 846 P.2d at 795; Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 648, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993) ("Continental"). The duty is to defend any action, regardless of its merit, that seeks damages potentially within the indemnity coverage. Horace Mann, 17 Cal.Rptr.2d 210, 846 P.2d at 795 (citing Gray v. Zurich Ins. Co., 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (Cal.1966)); Continental, 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506.
 
 
 26
 At the same time, an insurer's duty to defend is limited absolutely by the scope of the coverage purchased. La Jolla, 36 Cal.Rptr.2d 100, 884 P.2d at 1054; Allstate Ins. Co. v. Zuk, 78 N.Y.2d 41, 45, 571 N.Y.S.2d 429, 574 N.E.2d 1035 (1991). If there is no legal or factual circumstance that could trigger the duty to indemnify against a claim, then there is no duty to defend against it. Ringler Assocs. Inc. v. Maryland Cas. Co., 80 Cal.App.4th 1165, 96 Cal.Rptr.2d 136, 153 (2000); Zuk, 78 N.Y.2d at 45, 571 N.Y.S.2d 429, 574 N.E.2d 1035. See also Avondale Indus. Inc. v. Travelers Indem. Co., 774 F.Supp. 1416, 1423-425 (S.D.N.Y.1991) (discussing New York law). Furthermore, an insurer may withdraw from an ongoing defense if it becomes clear that the claim is wholly outside the indemnification agreement.[2] Any ambiguity as to the insurer's duty to defend is resolved in favor of the insured. Ringler, 96 Cal.Rptr.2d at 153; Charles F. Evans, Inc. v. Zurich Ins. Co., 95 N.Y.2d 779, 780, 710 N.Y.S.2d 301, 731 N.E.2d 1109 (2000) (citing Seaboard Sur. Co. v. Gillette, Co., 64 N.Y.2d 304, 310-11, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984)). See also, Horace Mann, 17 Cal.Rptr.2d 210, 846 P.2d at 796; U.S. Fidelity, 67 N.Y.2d at 232, 501 N.Y.S.2d 790, 492 N.E.2d 1206. California and New York law agree on all of these points.
 
 III
 
 27
 Although the scope of Liberty Mutual's employers liability coverage has remained relatively consistent over time, two modifications over the course of the last twenty years bear upon the insurer's obligation to defend the California actions. First, if the triggered policy was issued prior to January 1, 1986, a claims-made provision limits coverage to claims filed within three years of the end of the policy period. Later policies do not include this provision. Second, if a claimant's "last day of last exposure" was after January 1, 1995, Liberty Mutual's duty to defend or indemnify is subject to a high deductible inclusive of defense costs. For the purposes of this appeal, these restrictions taken together effectively limit Liberty Mutual's duty to defend against the California actions to claimants whose "last day of last exposure" was between January 1, 1986 and January 1, 1995.
 
 
 28
 The contracts in force for policy years 1986-94 provide (with certain limitations not relevant here):
 
 A. How This Insurance Applies
 
 29
 This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.
 
 
 30
 1. The bodily injury must arise out of and in the course of the injured employee's employment by you.
 
 
 31
 * * * * * *
 
 
 32
 3. Bodily injury by accident must occur during the policy period.
 
 
 33
 4. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.
 
 
 34
 * * * * * *
 
 B. We Will Pay
 
 35
 We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.
 
 
 36
 * * * * * *
 
 C. Exclusions
 This insurance does not cover:
 
 37
 * * * * * *
 
 
 38
 5. Bodily injury intentionally caused or aggravated by you;
 
 
 39
 * * * * * *
 
 D. We Will Defend
 
 40
 We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.
 
 
 41
 We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.
 
 
 42
 * * * * * *
 
 
 43
 (Emphases added.) The first step in ascertaining whether Liberty Mutual had a continuing duty to defend IBM after December 14, 1999 is to compare these contract terms with the allegations in the California complaints. See Horace Mann, 17 Cal.Rptr.2d 210, 846 P.2d at 795; Ruder & Finn, 52 N.Y.2d 663, 669, 439 N.Y.S.2d 858, 422 N.E.2d 518. With the exception of claims subject to the intentional-injury exclusion, Liberty Mutual does not dispute that the California plaintiffs allege bodily injuries potentially covered under its employers liability contracts. The disputed issue is which particular policy is triggered by the potentially covered claims asserted by each California plaintiff. The resolution of this issue turns on each claimant's "last day of last exposure" to an IBM cleanroom.
 
 
 44
 All of the underlying complaints alleged "prolonged ... exposure" to cleanroom chemicals without specifying a last day — or even a last year — of that exposure. Liberty Mutual concedes that such general allegations of exposure "potentially" implicate the coverage of any number of its IBM insurance contracts — issued both before and after 1986. As set out in Liberty Mutual's reservation-of-rights letters, each California plaintiff was required by interrogatory to specify an "alleged date of last exposure" and the dates specified range between 1977 and 1999. These dates of last exposure would trigger some policy years not subject to either the claims-made proviso or the defense-cost deductible; for such claims, Liberty Mutual would owe a defense.
 
 
 45
 Testing the allegations of the underlying complaint against the terms of the insurance contracts, we conclude that the trigger of coverage remains the last day of exposure to carcinogens in the cleanrooms. Section D of the contracts binds Liberty Mutual to defend IBM against any claim "for damages payable by this insurance." Section B undertakes to pay "all sums [IBM] legally must pay as damages," provided that the injury is "covered" by one of its policies. Coverage is in turn determined by Section A: "How this Insurance Applies." Thus, as to bodily injury by accident, Section A straightforwardly provides that it "must occur during the policy period." As to bodily injury by disease, Section A requires that such injury "be caused or aggravated by the conditions of [IBM's] employment," and that "[t]he employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period."
 
 
 46
 In this case, the "injury ... by disease" is the cancer, which is alleged to be "caused or aggravated by exposure" to carcinogens in IBM cleanrooms. The trigger of coverage as to each claim is each claimant's "last day of last exposure" to those carcinogens while employed at IBM, which is the last day of employment in IBM's California cleanroom facility. Obviously, exposure from employment in that facility ended on a day certain that presumably can be determined by, inter alia, interrogatories or employment records.
 
 
 47
 Liberty Mutual contends, however, that the 1998 stipulation between IBM and the California plaintiffs — which limited the scope of plaintiffs' claims for negligence, fraud, and strict liability (as well as ultra-hazard) — forecloses any continuing duty to defend IBM, citing the following provision[3]:
 
 
 48
 As to any plaintiff or decedent whose IBM employment commenced prior to January 1, 1983 and continued after January 1, 1983, the [negligence, fraud, strict liability and ultra-hazardous strict liability] Causes of Action in Plaintiffs' presently operative complaints are only asserted and only apply to the portion of said employment and to IBM's conduct which occurred prior to January 1, 1983.
 
 
 49
 (emphasis added.) This limitation fixes the last day that damages are sought for wrongdoing by IBM, but does not allege or set a day of last exposure — an issue of fact that is not the subject of the stipulation.
 
 
 50
 We conclude that the intent of the parties to the 1986-94 policies was to allocate the loss (with respect to each claimant) to a single year corresponding to the date of last exposure — either as ascertained by the allegations of the complaint or as otherwise appropriate. The intent of the parties is confirmed by the design and purpose of the "last exposure" trigger. Such triggers are common in insurance contracts covering risks of occupational disease. Their currency arose with the development of the "last exposure" rule in the apportionment of liability among employers and insurers for occupational injuries with long, complex gestation periods. See Edward M. Vokoun, Using the Last Exposure Rule in the Determination of Liability of Employers and Insurers for Occupational Diseases, 20 Forum 102, 107-111 (1984). The widespread use of the "last exposure" trigger has been driven by two salient advantages: (i) it eliminates the need for proof as to which particular exposures (over the course of what may be many years) actually caused a claimant's injuries; and (ii) it assigns coverage to a particular contract in a predictable way. See Roseburg Forest Prods. v. Long, 325 Or. 305, 937 P.2d 517, 518-519 (1997); see also Alliancewall Corp. v. Workmen's Comp. Appeal Bd., 161 Pa.Cmwlth. 523, 637 A.2d 724, 726 (1994) ("The certainty provided by the `last exposure' test acts to avoid any introduction of causation issues where the contest is a question of which insurance company [or policy] is responsible for coverage."); Bollmann v. Certain-Teed Prods. Corp., 651 S.W.2d 613, 615 (Mo.Ct.App.1983) (describing the "last exposure" trigger as a "`[r]ule of convenience' [that] contemplates the situation where an employee has been exposed to the hazards of occupational disease while employed by more than one employer [or covered by more than one policy]"). As Liberty Mutual acknowledges, "a defining characteristic of [the `last exposure' trigger] is that only one policy and policy year can be `triggered' for any employee claim"; the relevant policy is the one in effect on "the employee's last day of last exposure to substances causing [the] disease."
 
 V
 
 51
 Liberty Mutual argues that reading its policy as a whole, it is triggered on the "last day of last exposure" for which damages are actually sought because the "last exposure" trigger in Section A is limited to "such bodily injury" as is indemnifiable under Section B. Since plaintiffs stipulate that they do not seek damages with respect to any policy year after 1982, Liberty Mutual contends that no subsequent policy would provide coverage and therefore cannot be triggered. This argument is unsustainable.
 
 The trigger clause states:
 
 52
 Bodily injury by disease must be caused or aggravated by the conditions of [IBM's] employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period. (emphasis added).
 
 
 53
 The indemnification provision explains that Liberty Mutual will pay "all sums [IBM] must legally pay as damages because of bodily injury to [IBM's] employees."
 
 
 54
 As the cases relied upon by Liberty Mutual explain, the "`clear and explicit' meaning of [insurance policy] provisions, interpreted in their `ordinary and popular sense' controls judicial interpretation unless `used by the parties in a technical sense or a special meaning is given to them by usage.'" Vandenberg v. Superior Ct., 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229, 244-45 (Cal.1999); accord McGrail v. Equitable Life Assur. Soc. of the U.S., 292 N.Y. 419, 424-25, 55 N.E.2d 483 (1944). Absent some contrary indication, "such bodily injury" in Section A refers to the nearest preceding referent, which is the phrase "bodily injury by disease caused or aggravated by the conditions of [IBM's] employment." "[S]uch bodily injury" does not take meaning from the indemnification clause, which is subsequent.
 
 VI
 
 55
 Liberty Mutual next argues that the 1998 stipulation is extrinsic evidence that necessarily establishes December 31, 1982 as the last day of last exposure, thus triggering the 1982 policy only. As noted supra, the general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy. Horace Mann, 17 Cal.Rptr.2d 210, 846 P.2d at 795; Ruder & Finn, 52 N.Y.2d 663, 669, 439 N.Y.S.2d 858, 422 N.E.2d 518. A narrow, but widely recognized exception to the rule allows an insurer to refuse or withdraw a defense if evidence extrinsic to those sources and "unrelated to the merits of plaintiff's action[,] plainly take the case outside the policy coverage." Allan D. Windt, Insurance Claims and Disputes, § 4:4 at pp. 293-94 (West 2001) (citing cases). Courts in both New York and California recognize the exception, see, e.g., Town of Moreau v. Orkin Exterminating, 165 A.D.2d 415, 568 N.Y.S.2d 466, 468 (N.Y.App.Div.1991); Haskel, Inc., v. Superior Ct., 33 Cal.App.4th 963, 39 Cal. Rptr.2d 520, 523 (1995), though the exception is evidently more robust on the West Coast.[4] In both New York and California, however, where the evidence offered does not allow a court to "eliminate the possibility that the insured's conduct falls within coverage of the policy," the insurer is not relieved of its duty to defend. Haskel, 39 Cal.Rptr.2d at 526. See also Avondale, 774 F.Supp. at 1424 (citing cases).
 
 
 56
 The 1998 stipulation does not eliminate the possibility that some of the plaintiffs in each case will be found to have been last exposed to carcinogens after 1982; the stipulation does not bear upon that issue. In order to preserve portions of certain claims otherwise restricted under California labor law, plaintiffs who were exposed to San Jose cleanrooms prior to January 1, 1983, and who continued to be employed by IBM after that date, agreed that their claims of negligence, fraud, strict liability and ultra-hazardous strict liability were "only asserted and only apply to the portion of said employment and to IBM's conduct which occurred prior to January 1, 1983." Liberty Mutual characterizes this stipulation as a "binding judicial admission" — that "could not possibly later be `opposed to otherwise provable fact'" — that plaintiffs' "last day of last exposure" (with respect to the negligence and strict liability claims) was no later than December 31, 1982. Although the stipulation fixes an end date for recovery, it does not set the claimant's "last day of last exposure" to cleanroom conditions causing or aggravating bodily injury. Indeed, as Liberty Mutual's coverage position letters reflect, many California plaintiffs who are bound by the 1998 stipulation brought suit against IBM for bodily injury caused and aggravated by exposure well after December 31, 1982.
 
 
 57
 * * * * * *
 
 
 58
 Because we conclude that Liberty Mutual's duty to defend IBM did not end on December 14, 1999, we necessarily affirm the district court's holding with respect to the minor plaintiffs' claims. This Court's decision in IBM v. Liberty Mutual Fire Ins. Co., 303 F.3d 419, 426 (2d Cir.2002), binds Liberty Mutual to defend IBM against those claims under New York law, and the California Supreme Court's decision in Buss v. Superior Ct. supports the same result under California law. 16 Cal.4th 35, 65 Cal.Rptr.2d 366, 939 P.2d 766, 775 (1997) (reaffirming that an insurer is duty-bound to defend its insured against all claims in a "mixed" action (i.e., one in which only some of the claims are potentially covered)).
 
 CONCLUSION
 
 59
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Defendant-appellee Zurich Insurance Company furnished comprehensive general liability coverage over much the same period and is a party to this appeal apparently because it may have a duty to defend (or to contribute to defense costs) if Liberty Mutual's duty to defend is held to have ended on December 14, 1999, and because Liberty Mutual disclaimed any obligation to defend against the claims of minor plaintiffs. The issues that concern Zurich are addressed by our rulings on the dispute between IBM and Liberty Mutual
 
 
 [2]
 See discussion of the extrinsic evidence rule at section VI. supra.
 
 
 [3]
 The Stipulation did not apply to minor plaintiffs; its purpose was apparently to preserve portions of certain claims otherwise barred under California labor law
 
 
 [4]
 This Court has recently noted — in related litigation — that the applicability of the extrinsic evidence exception in New York is "unclear."IBM v. Liberty Mutual Fire Ins. Co., 303 F.3d 419, 426 (2d Cir.2002). But see Allstate Ins. Co. v. Zuk, 78 N.Y.2d 41, 45, 571 N.Y.S.2d 429, 574 N.E.2d 1035 (1991) (noting that the relevant complaint alleged a potential basis for coverage but recognizing that "an insurer can be relieved of its duty to defend if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured") (emphasis added); Avondale Indus., Inc. v. Travelers Indem. Co., 774 F.Supp. 1416, 1424-26 (S.D.N.Y.1991) (recognizing the rule and surveying New York law).