10-4408-cv
Horowitz v. AIG, Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 15th day of August, two thousand twelve.

PRESENT:
> PIERRE N. LEVAL,
> CHESTER J. STRAUB,
> PETER W. HALL,
> > *Circuit Judges*.

---

ROBERT AND HARLENE HOROWITZ, on behalf of themselves
and all others similarly situated,
> *Plaintiffs-Appellants*,

v.                                                                No. 10-4408-cv

AMERICAN INTERNATIONAL GROUP, INC., AMERICAN
INTERNATIONAL INSURANCE COMPANY OF CALIFORNIA, INC.,
AIU HOLDINGS, INC. (now known as CHARTIS, INC.),
CHARTIS, INC., AIG PRIVATE CLIENT GROUP, AIU HOLDINGS LLC
(also known as CHARTIS INTERNATIONAL LLC), AIG PROPERTY
CASUALTY GROUP, INC. (now known as CHARTIS, INC.),
> *Defendants-Appellees,*

JOHN DOES 1-49,
> *Defendants.*

---

FOR PLAINTIFFS-APPELLANTS: BRAD N. FRIEDMAN, JOSHUA KELLER, and JENNIFER LEIGH YOUNG, Milberg, LLP, New York, New York.

FOR DEFENDANTS-APPELLEES: MICHAEL B. CARLINSKY, and JANE M. BYRNE, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York.

Appeal from a judgment of the United States District Court for the Southern District of New York (Crotty, *J.*). **UPON DUE CONSIDERATION**, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Robert and Harlene Horowitz, customers of Bernard L. Madoff Investment Securities, LLC ("BLMIS") appeal from the district court's dismissal of their breach of contract claim against AIG, Inc.[1] From about December 1997 to December 2008, the Horowitzes invested a total of $4,327,230.55 with BLMIS; withdrew $4,553,000 from the account; and believed at the end of that period that the balance in their account was more than $8.5 million. In 2008, the Horowitzes purchased a homeowner's insurance policy from AIG which included a Fraud Safeguard endorsement that provided for up to $30,000 in coverage for losses resulting from fraud, embezzlement, or forgery during the period of coverage. After learning that BLMIS was a Ponzi scheme and that the securities reflected on statements provided by BLMIS were fictitious, the Horowitzes filed a claim with AIG to invoke coverage under the Fraud Safeguard endorsement. AIG denied the claim because, *inter alia*, the Horowitzes had not suffered a loss under the policy's terms. The Horowitzes initiated this action challenging AIG's interpretation of what constitutes a covered direct loss under the policy, and how that covered direct loss is calculated. We assume

---

[1] The plaintiffs have sued AIG, Inc., American International Insurance Company of California, Inc., AIU Holdings, Inc. (now known as Chartis, Inc.), Chartis, Inc., AIG Private Client Group, AIU Holdings LLC (a/k/a Chartis International LLC), AIG Property Casualty Group, Inc. (now known as Chartis, Inc.). For ease of reference all defendants are referred to collectively as "AIG."

2

the parties' familiarity with the facts and issues presented on appeal, elaborating only as necessary to explain our decision to affirm the district court.

**Discussion**

We review *de novo* the dismissal of a complaint on Rule 12(b)(6) grounds and the court's interpretation of the contract. *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 708 (2d Cir. 2011); *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d. Cir 2007). The rules of contract construction are well settled under New York law; the starting point is the contract's language.[2] "The cardinal principle for the construction and interpretation of insurance contracts . . . is that the intentions of the parties should control . . . [and] the meaning of particular language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (internal quotations and citation omitted). Where the provisions of the policy "are clear and unambiguous, they must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement." *U.S. Fidelity & Guar. Co. v. Annunziata*, 492 N.E.2d 1206, 1207 (N.Y. 1986) (internal quotations omitted). The language of the contract should be given meaning in the *context* of the instrument as a whole, including any endorsements or riders, *see Richner*

---

[2] In their moving papers below the parties cited to and relied on both California and New York law. The district court concluded that the laws of both states are substantially similar and considered the merits of the complaint and motion to dismiss under both states' laws. Perceiving little difference between the laws of the two states as well, we cite, where necessary, to New York law. *See I.B.M. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter . . . unless the laws of the competing jurisdictions are actually in conflict. . . . In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York is among the relevant choices, New York courts are free to apply it.").

*Commc'ns, Inc. v. Tower Ins. Co. of N.Y.*, 898 N.Y.S.2d 615, 617 (N.Y. App. Div. 2d Dep't 2010), and the circumstances under which the contract was executed, *see Nemmer Furniture Co. v. Select Furniture Co.,* 208 N.Y.S. 2d 51, 55 (N.Y. Sup. Ct. 1960).

The Horowitzes take issue with the district court's suggestion that the Madoff Ponzi scheme is not a peril covered by the Fraud Safeguard policy.   We agree with the Horowitzes that, in the context of a Fraud Safeguard policy such as the one at issue in this case, the district court's conclusion that a Ponzi scheme is not a predictable peril is unpersuasive.   Indeed, a Ponzi scheme is likely just the sort of fraud anticipated by the policy drafters.   That said, in our view the dispute in this case turns not on whether the peril, i.e., the Madoff fraud, is a covered event, but on the Horowitzes' remaining arguments concerning which losses flowing from that fraud are directly attributable to the covered conduct and thus recoverable under the policy.

Construing the policy in their favor, the Horowitzes contend that the term "loss" can fairly be read to include: (1) the full account balance as reflected in their final BLMIS statement; (2) earnings reasonably expected on their capital investment based on a growth assumption or implied interest rate; (3) net loss in constant dollars; (4) non-recoverable tax payments; and/or (5) legitimate growth on investments during the pre-Ponzi period.   Arguing that each of these is a reasonable interpretation of a covered loss under the policy's terms and an appropriate measure of loss under the circumstances, the Horowitzes maintain that the district court deviated from accepted principles of contract construction and failed to consider the term "loss" in the context of the policy as a whole and from the reasonable expectations of the insured.   For the reasons that follow, we agree with the district court that the policy is not ambiguous and that the covered loss is

4

limited only to the "something of value" that the Horowitzes were induced to part with as a result of the fraud.

Here, the policy provides coverage for the "loss of money, securities, or other property . . . resulting directly from fraud . . . perpetrated against [the insured] . . . during the Policy Period." Fraud is defined in the policy as the "intentional perversion of truth by someone . . . in order to induce [the insured] to part with something of value**."** Under the Exclusions provision of the policy there is no coverage for any indirect loss "result[ing] [from] any fraud guard event including but not limited to . . . [the] inability to realize income that you would have realized had there been no loss or damage to money, securities, or other property." In clear and plain terms, the Fraud Safeguard policy covers the loss of money, securities, or other property resulting directly from the intentional perversion of the truth by someone who has thereby induced the insured to part with something of value, and the policy expressly does not cover the insureds' indirect losses of such things as ability to realize income from the money, securities, or other property had the money, securities, or other property remained in the hands of the insureds.

We disagree with the Horowitzes that a fair reading of the policy would treat the final BLMIS account balance as the measure of their covered loss. The policy, on its face, covered the direct loss of money, securities, or property as a result of fraud. A "direct loss" is "[a] loss that results immediately and proximately from an event." *Black's Law Dictionary* (9th ed. 2009). The Madoff fraud consisted of Madoff coaxing investors to part with funds and transfer those funds to him for investing. The only "thing of value" the Horowitzes were induced to part with by Madoff's lies was the monies they transferred to BLMIS― which, fortunately for them, they have fully recovered.

5

The Horowitzes next maintain that AIG improperly calculated the value of their capital investment in failing to account for "reasonably expected earnings" based on a growth assumption or an implied interest rate. The policy expressly excludes coverage for indirect losses—a term that includes the inability to realize income from the money, securities, or other property that would have been realized but for the fraud. The policy makes plain that indirect losses, even those that are a foreseeable outgrowth of the initial direct loss such as the failure to realize income that may have materialized but for the initial loss, are not covered. *See Black's Law Dictionary* (9th ed. 2009) (indirect loss, i.e., consequential loss is defined as a "loss arising from the results of damage rather than from the damage itself"). Furthermore, indirect losses under the policy are not limited, as the Horowitzes argue, to only the "inability to realize income" or the "payment of damages." The policy excludes coverage for *any* loss not directly resulting from the fraud.

The Horowitzes also contend that the "thing of value" lost is actually a security. In other words, the Horowitzes argue that their arrangement with Madoff was a securities contract valued at $8.5 million which they have now lost in connection with a fraud event. Again, the "thing of value" the Horowitzes were fraudulently induced to part with was their capital investment, and there is no suggestion in the record that they transferred securities to Madoff in order to satisfy their investment obligation.

Lastly, the Horowitzes argue that there is some indication that BLMIS started out as a legitimate investment vehicle and only gradually evolved into a Ponzi scheme. Thus the Horowitzes seek a declaration that "Defendants are unable to identify the date the [Madoff] Ponzi scheme started, [and they] cannot [therefore] employ the loss methodology at issue because earnings and/or withdrawals before the Ponzi scheme started were all legitimate." The district

6

court observed that the Horowitzes have not alleged that they invested and earned sufficient returns during any so-called pre-Ponzi period as to constitute a loss over and above their net gain of $225,000, which they have already received back directly from BLMIS. Even if we were to accept that such earnings could constitute a covered direct loss under the policy, we agree with the district court that the claim is inadequately pled.

**Conclusion**

We have fully considered all of the Horowitzes' remaining claims and arguments, and we conclude that they are without merit. The judgment of the district court is AFFIRMED.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk

7